**ENSIGN FINANCIAL CORPORATION and Hamilton Holding Company, Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, in its own Capacity, as Successor in Interest to Federal Savings and Loan Insurance Corporation, and as manager of the FSLIC Resolution Trust Fund, T. Timothy Ryan, Jr., Director, Office of Thrift Supervision, in his Individual and Official Capacity and as Successor in Interest to the Federal Home Loan Bank Board, and Ensign Bank, FSB, Defendants.**

**No. 90 CIV 5692 (KC).**

United States District Court, S.D. New York.

Feb. 19, 1992.

Sidney S. Rosdeitcher, Helen B. Kim, Paula A. Tuffin, Isaac D. Corre, Paul Weiss Rifkind Wharton & Garrison, New York City, John K. Villa, Williams & Connolly, Washington, D.C., for plaintiffs.

Harris Weinstein, Thomas J. Segal, Kenneth G. Guido, Office of Thrift Supervision, Office of Chief Counsel, Washington, D.C., Harvey Kurzweil, Jonathan W. Miller, Robin D. Adelstein, Dewey Ballantine, New York City, Mark Warren, Buffalo, N.Y., Stuart M. Gerson, Renee M. Wohlenhaus, Dept. of Justice, Civ. Div., Thomas A. Schulz, Marta Berkeley, Washington, D.C., for defendants.

## MEMORANDUM ORDER

CONBOY, District Judge:

Currently pending before this Court is defendants' motion to dismiss the complaint. For the reasons that follow, defendants' motion is granted in part and denied in part.

### Background

#### A. The Parties

Plaintiff Hamilton Holding Company ("Hamilton") owns 100% of plaintiff Ensign Financial Corporation ("Financial"), which in turn owns 100% of the stock of defendant Ensign Bank, FSB ("Ensign Bank"). Complaint ¶¶ 13–14. Plaintiffs created Ensign Bank in 1983 to acquire two insolvent savings and loan associations pursuant to an Assistance Agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC") and accompanying resolutions of the Federal Home Loan Bank Board ("FHLBB"). *Id.* ¶¶ 32–48. Prior to August 1989, the FSLIC insured deposits of savings and loan associations and acted under the supervision and approval of the FHLBB. *Id.* ¶ 15. The FHLBB regulated and supervised federally chartered savings and loan associations and enforced compliance with all applicable regulatory requirements. *Id.* ¶ 17. In August 1989, Congress passed the Financial Institutions Reform and Recovery Act ("FIRREA") which did away with the FSLIC and designated the Federal Deposit Insurance Corporation ("FDIC") to be the FSLIC's successor. FIRREA also did away with the FHLBB, created the Office of Thrift Supervision ("OTS"), and designated OTS to be the FHLBB's successor. *Id.* ¶¶ 15–17. Defendant T. Timothy Ryan, Jr. is the director of OTS.

#### B. The Assistance Agreements

Beginning in the late 1970's and continuing into the 1980's, the savings and loan industry experienced a severe financial crisis. *Id.* ¶ 19. In order to spare the FSLIC the enormous costs of paying insured depositors and liquidating insolvent thrifts, the FSLIC, with the approval of the FHLBB and with the expanded powers Congress gave to it under the Garn–St. Germain Depository Institutions Act of 1982, undertook a program to induce pri-

vate entrepreneurs, like plaintiffs, to take over ailing thrifts. *Id.* ¶¶ 20–30.

Central to this program was a concept known as "supervisory goodwill," which the FSLIC and the FHLBB used as a substitute for cash assistance for acquiring thrifts. Specifically, the FHLBB determined that acquisitions of insolvent thrifts should be accounted for by the "purchase" method of accounting in accordance with then-applicable generally accepted accounting principles. ("GAAP"). *Id.* ¶ 24. Under the purchase method of accounting, the book value of the acquired thrifts' assets and liabilities was adjusted to the fair market value at the time of the acquisition. *Id.* ¶ 25. Any negative net worth resulting from the excess of liabilities the thrifts assumed over the assets the thrifts acquired was offset by an equal and corresponding amount of "goodwill," an asset the thrifts could amortize over a specific period of time. *Id.* The FHLBB recognized "goodwill" as an asset the thrifts could use to meet federal capital requirements, and the FHLBB permitted acquiring thrifts to amortize this asset over a long period so that acquiring thrifts would have sufficient time to overcome the capital deficits the acquiring thrifts assumed. *Id.* ¶¶ 24, 26.

As part of this program, the FSLIC induced plaintiffs to take over three insolvent thrifts pursuant to two Assistance Agreements explicitly incorporating the concepts discussed above.

In 1983, plaintiffs created Ensign Bank and entered into an Assistance Agreement with, *inter alia,* the FSLIC, to take over Washington Federal Savings and Loan Association ("Washington") and Community Federal Savings and Loan Association ("Community"). *Id.* ¶ 32. These banks had an aggregate negative net worth of $171 million. *Id.* ¶¶ 34, 37. In approving this acquisition, the FHLBB specifically determined that the cost to the FSLIC of entering into this agreement was substantially less than the cost of liquidating Washington and Community. *Id.* ¶ 48.

The FSLIC's only tangible contributions to this transaction were $7.4 million in cash, an $18 million note, and an agreement to indemnify up to $12 million of liabilities. *Id.* ¶ 50. FHLBB promised that $24 million in cash and notes that Hamilton and the FDIC were going to provide Ensign bank "would be credit[ed] to Ensign Bank's net worth." Complaint Ex. C at p. 2. However, the principal inducement to plaintiffs was the FSLIC's and the FHLBB's promises that the FHLBB would recognize, for regulatory purposes, the $171 million of goodwill created by the acquisition, and that the FHLBB would permit the plaintiffs to amortize this asset over 35 years. *Id.* ¶¶ 51, 53.

Thus, the FSLIC promised that "any computations made for the purposes of ... reports to [the FHLBB] ... during the term of the Agreement" would be governed by GAAP, as in effect in the savings and loan industry and as modified by the FSLIC on September 1, 1982 and "as further modified by any resolution or action of the [FHLBB]" taken at the same time as the FHLBB's approval of the transaction. Complaint Ex. B § 11.

The "resolution or action" referred to by the parties was a forbearance agreement between the FHLBB and the plaintiffs, containing, among other things, the FHLBB's promise that "[f]or purposes of reporting to the [FHLBB], the value of any intangible assets [*i.e.,* supervisory goodwill] resulting from the accounting of the transaction in accordance with the purchase method of accounting may be amortized over a period not to exceed 35 years by the straight line method." Complaint Ex. C at p. 2.

In return for this promise, plaintiffs agreed to contribute to Ensign Bank $5 million in cash; a $6 million promissory note; and the stock of two subsidiaries worth $11 million. *Id.* ¶ 49. (In 1987, Hamilton substituted for the stock of these subsidiaries and another company later acquired by Ensign Bank, a promissory note of $15.2 million, of which $13.4 million was attributable to the stock of the two subsidiaries Hamilton contributed in 1983. *Id.*). Plaintiffs also agreed to assume the liabilities of the insolvent thrifts and to maintain Ensign Bank's net worth at specified levels. *Id.*

In negotiating these agreements, plaintiff Hamilton specifically conditioned its participation in the transaction on the FSLIC's and the FHLBB's agreement to accept the goodwill for regulatory purposes and to amortize the goodwill over a 35 year period. *Id.* ¶¶ 40, 57. Hamilton would not have entered the agreement but for these promises. *Id.* ¶ 57.

In 1987, the plaintiffs, Ensign Bank and, *inter alia,* the FSLIC entered into a second Assistance Agreement to take over another insolvent thrift, Fort Lee Savings and Loan Association ("Ft. Lee"). This thrift had a negative net worth of $32 million. *Id.* ¶ 63. The FSLIC put in only $12 million in cash; the principal contribution, once again, was the FSLIC's and the FHLBB's promise to recognize $20 million in supervisory goodwill for regulatory purposes and permit the goodwill's amortization over 25 years. *Id.* ¶¶ 67, 75; Complaint Ex. D § 17; Complaint Ex. F at p. 2. Plaintiffs' bid on Ft. Lee was expressly conditioned on the FSLIC's and FHLBB's promises regarding supervisory goodwill. Without these promises, Ft. Lee would have been insolvent and would have had a negative net worth of $20 million. *Id.* ¶ 68. Plaintiffs would not have agreed to take over Ft. Lee on this basis. *Id.*

From 1983 until the enactment of FIRREA, the FSLIC and the FHLBB recognized their obligations to accept goodwill for regulatory purposes. *Id.* ¶¶ 61, 83. Plaintiffs and Ensign Bank diligently performed their part of the bargain at the same time, notwithstanding the very substantial burden of amortizing good will as an annual charge against earnings. Ensign bank was sufficiently profitable to pay nearly $5 million on an $18 million FSLIC note [1]. Nevertheless, plaintiffs never received any income from Ensign Bank. *Id.* ¶¶ 60, 82.

## C. FIRREA and the OTS' Repudiation of the Agreements

FIRREA, which as noted above was passed by Congress in August 1989, created new capital standards for thrifts under which goodwill was to be phased out over three years and would not be accepted as capital for regulatory purposes. *Id.* ¶¶ 87–88. OTS interpreted FIRREA's capital standards to require OTS to repudiate the promises made by the FSLIC and the FHLBB regarding the recognition of supervisory goodwill for regulatory purposes. As a result, Ensign Bank was transformed from a thrift in full compliance with all federal regulatory requirements into a thrift hopelessly out of compliance with the new capital standards. *Id.* ¶¶ 93–111.

Plaintiffs assert that OTS refused to exercise its discretionary authority, said to be available pursuant to FIRREA, to grant Ensign Bank exceptions and exemptions from the new capital standards. *Id.* ¶¶ 106–107. OTS also rejected a capital plan submitted by Ensign Bank which included an offer by plaintiffs to infuse additional assets worth $100 million in an effort to save the bank, contingent on a satisfactory resolution of the claims arising out of the repudiation of the promises made to plaintiffs. *Id.* ¶ 106. As a result, Ensign bank was subjected to severe restrictions on its lending activities, causing its financial condition to deteriorate substantially and rapidly. *Id.* ¶¶ 98, 103. Nevertheless, plaintiffs continued their efforts to negotiate a plan with the FDIC to recapitalize and revitalize Ensign Bank. *Id.* ¶¶ 107–110.

On August 31, 1990, in the midst of those efforts, and without any prior warning to plaintiffs, Ensign Bank was seized by OTS and placed under a receiver appointed to liquidate the bank. *Id.* ¶¶ 107–111. OTS thereby effectively completed the destruction of plaintiffs' bargain with the FSLIC and the FHLBB.

On September 4, 1990, plaintiffs Hamilton and Ensign Financial commenced this lawsuit which asserts claims against the FDIC, as successor in interest to the FSLIC, and against Ensign Bank. Both

---

1. The note was given to Ensign Bank in return for an income capital certificate that entitled the FSLIC to dividends that repaid the note out of Ensign Bank's earnings. Complaint ¶¶ 50, 60.

the FSLIC and Ensign bank are signatories to the Assistance Agreements, and Ensign Bank is the holder of promissory notes Hamilton gave to Ensign Bank in satisfaction of obligations undertaken by plaintiffs in the agreements. The remaining defendant is OTS, the successor in interest to the FHLBB.

Plaintiffs' complaint contains five causes of action, denominated as counts in the plaintiffs' pleadings. In count I plaintiffs claim that "[i]n prohibiting Ensign Bank from using the supervisory goodwill and tangible financial assistance in the manner contemplated by the 1983 and 1987 Assistance Agreements and related Agreements, the Director [of OTS] acted beyond the authority conferred upon him by FIRREA." Complaint ¶ 115. Plaintiffs also maintain in count I that "[i]f FIRREA [is] construed to authorize such actions, FIRREA and the conduct of the Director thereunder [ ] constitute a deprivation of property without due process of law in violation of the fifth amendment of the Constitution." Complaint ¶ 115. In count II plaintiffs claim that they are entitled to relief because defendants failed to give plaintiffs the consideration for which plaintiffs bargained. Moreover, plaintiffs maintain that the purpose of the contract has been frustrated. Complaint ¶¶ 116–121. In count III plaintiffs assert that they are entitled to relief because defendants' actions constitute a breach of contract. Complaint ¶¶ 122–124. In count IV plaintiffs maintain that "the [OTS] [d]irector's refusal to recognize the supervisory goodwill and the tangible financial assistance under the 1983 and 1987 Agreements is an inequitable and unconscionable repudiation of the central promises and assurances intended by FHLBB and FSLIC to induce plaintiffs to enter into the 1983 and 1987 Assistance Agreements and related agreements." Complaint ¶ 131. In Count V plaintiffs contend that "[b]y excluding supervisory goodwill and the tangible financial assistance from FSLIC and Hamilton for purposes of calculating compliance with federal capital requirements, the Director [of OTS] has effected an unlawful taking of these contract rights within the meaning of the Fifth Amendment to the United States Constitution." *Id.* ¶ 134.

Plaintiffs seek a judgment that rescinds the 1983 and 1987 Assistance Agreements and all related agreements, and restores to plaintiffs all the benefits the plaintiffs conferred on the defendants as a result of the 1983 and 1987 Assistance Agreements. Additionally, plaintiffs want the court to declare that they have no obligation to pay the $3 million outstanding on the $6 million note Hamilton gave as part of the 1983 Assistance Agreement, and that this note is unenforceable. Furthermore, the plaintiffs want the Court to declare that they have no obligation to pay $13.4 million of the $15.2 million note Hamilton gave to Ensign Bank, and that this note, as well, is unenforceable. Finally, plaintiffs ask for such other and further relief, including costs and reasonable attorneys' fees, that are just and proper. Complaint (Prayer for Relief) at pp. 56–57.

## Discussion

## I. JURISDICTION

### a. Jurisdiction over OTS

In general, the federal government is immune to suit unless it expressly waives that immunity. The Tucker Act, 28 U.S.C.A. § 1491 *et seq.*, which is one such waiver, provides, *inter alia*, that the Claims Court has jurisdiction to entertain contract suits against the government that seek more than $10,000 in damages. While courts have "often assumed that the Claims Court has exclusive jurisdiction of [contract] claims [against the government] for more than $10,000.... the [Claims] Court's jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court." *Bowen v. Massachusetts*, 487 U.S. 879, 910 n. 48, 108 S.Ct. 2722, 2740 n. 48, 101 L.Ed.2d 749 (1988).

The Administrative Procedure Act, 5 U.S.C.A. § 701 *et seq.*, embodies another waiver of sovereign immunity by the federal government. It provides that:

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or an employee thereof failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or the duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C.A. § 702.

 Defendants maintain that plaintiffs' claim against the government is a contract claim, and therefore can only be brought in the Claims Court. However, "[n]ot all contract claims against the government are in the exclusive jurisdiction of the Claims Court. 'The Tucker Act does not impliedly forbid [district courts from] issu[ing] [ ] a declaratory judgment stating that [a plaintiff] possesses contract rights against the United States.'" *Charter Federal Savings Bank v. Director, Office of Thrift Supervision*, 773 F.Supp. 809, 817 (W.D.Va.1991) (quoting *Laguna Hermosa Corp. v. B.E. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981)). As we have noted, in this case, plaintiffs do not seek money damages. Rather, they seek rescission and declaratory relief against OTS because of its failure to perform as required by the forbearance agreements with plaintiffs[2]. Accordingly, this Court has jurisdiction under the APA and 28 U.S.C.A. § 1331 (federal question jurisdiction) to entertain plaintiffs' claims against OTS. *See Chemung County v. Dole*, 781 F.2d 963, 969 (2d Cir.1986) (because the plaintiff did not seek specific performance of a government contract or money damages, but was seeking equitable relief, which included, *inter .alia*, a declaration that a contract had been properly awarded to it, the district court had jurisdiction over the plaintiff's claim under the APA); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir.1983) (disappointed bidders have standing in district court pursuant to the APA to challenge the government's award of a contract to another party, when the relief the bidders seek is not specific performance or monetary damages, but cancellation of the government's contract with the other party); *Rowe v. United States*, 633 F.2d 799, 801 (9th Cir.1980) (APA gives district court jurisdiction to review an agency's action in refusing to award leases), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981); *Lehner v. United States*, 685 F.2d 1187, 1191 (9th Cir.1982) (APA gives district court jurisdiction to grant equitable

---

**2.** The fact that the plaintiffs may obtain monetary relief by means of its rescission claim does not make plaintiffs' claim a suit for money damages forbidden under the APA. In *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) the Supreme Court noted that its cases

had long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an

order providing for the reinstatement of an employee with back pay, or for "the recovery of specific property or *monies,* ejectment from land, or injunction either directing or restraining the defendant officers's actions." *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 688 [69 S.Ct. 1457, 1460, 93 L.Ed. 1628] (1949) (emphasis added). The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages."

*Id.* at 893, 108 S.Ct. at 2731–32.

relief), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 790 (1983)[3].

We observe that Congress has waived OTS' sovereign immunity under 12 U.S.C.A. § 1464(d)(1)(A), which provides that the Office of Thrift Supervision "shall be subject to suit (other than suits on claims for money damages) . . . in the United States district court for the judicial district in which the savings associations's home office is located. . . ." *Id.* Defendants assert that this statute does not grant this Court jurisdiction over plaintiffs' suit against OTS because "Ensign Bank is not a named plaintiff, and the two holding companies that are named plaintiffs are based in Miami, Florida—outside the jurisdiction of this Court." Defendants Memorandum in Support of their Motion to Dismiss at 34. As we have noted, however, OTS has already seized the Ensign Bank, and it is therefore named only nominally as a party defendant herein. Because plaintiffs have not alleged jurisdiction pursuant to § 1464(d)(1)(A) over their claims against OTS, which are in a sense partly derivative of the rights of Ensign Bank, we will not address this issue further.

### b. *Jurisdiction Over the FDIC*

■ This court has jurisdiction over plaintiffs' claims against the FDIC because Congress has waived the FDIC's sovereign immunity. 12 U.S.C.A. § 1819(a) Fourth. "Section 1819(a) Fourth states that the Federal Deposit Insurance Corporation has the power 'to sue and be sued and complain and defend, in any court of law or equity, State or Federal.'" *Charter Federal Savings Bank v. Director, Office of Thrift Supervision,* 773 F.Supp. 809, 816 (W.D.Va.1991) (quoting 12 U.S.C.A. 1819(a) Fourth). This statute grants district courts jurisdiction to rescind contracts with the

FDIC and to provide declaratory relief. *See Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision,* 930 F.2d 883, 887–92 (Fed.Cir.1991) (rescission and restitution); *Charter Federal Savings Bank v. Director, Office of Thrift Supervision,* 773 F.Supp. at 816–19 (declaratory relief); *see also Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision,* 951 F.2d 1093, 1096 n. 4 (9th Cir.1991) (permitting plaintiff thrift to go forward on its rescission and restitution claims against the FDIC in the district court)[4].

■ Defendants contend that even though plaintiffs have not named the United States as a defendant in this action, this suit is, in reality, a suit against the United States for monetary relief. Defendants point out that the FDIC will pay out any money judgment that this Court enters against it from the FSLIC resolution fund, and that the FDIC can get that fund replenished simply by asking the United States Treasury for more money. Because the United States has not waived its sovereign immunity, and because the United States might be the ultimate source of funds for any judgment this Court enters against the FDIC, defendants argue that this Court does not have jurisdiction over this suit against the FDIC.

Defendants' contentions are flawed for a number of reasons. First of all, defendants' argument converts the "sue and be sued clause" contained in 12 U.S.C.A. § 1819(a) Fourth into a dead letter. Were we to take defendants' reasoning to its logical conclusion, no plaintiff could sue the FDIC for monetary relief because the funds the FDIC might use to pay for the judgment could come from the United States treasury.

---

**3.** We note that the ninth circuit has limited the holdings in both *Rowe* and *Laguna* to their facts. *See North Side Lumber Co. v. Block,* 753 F.2d 1482, 1484–86 (9th Cir.1985) (district court does not have jurisdiction to declare a contract with the Department of Agriculture void for impracticability). Keeping in mind this circuit's admonition " '[to] be careful not to subvert the congressional objectives underlying the enactment of the judicial review statute by allowing the government to give an overly expansive

scope to the notion of claims 'founded upon' contract,' ", *B.K. Instrument, Inc. v. United States,* 715 F.2d at 727 (quoting Wright, Miller & Cooper, *Federal Practice and Procedure,* § 4101 at 210–211 (1972)), we decline to adopt the reasoning espoused in *North Side.*

**4.** Defendants do not contest that this Court has jurisdiction over Ensign Bank.

Moreover, in *C.H. Sanders Co. v. BHAP Housing Development Fund, Inc.*, 903 F.2d 114 (2d Cir.1990), the second circuit implicitly rejected the argument the defendants raise here. In *Sanders*, the plaintiffs sued the United States Department of Housing and Urban Development's ("HUD") under HUD's own "sue and be sued clause." *Id.* at 120. The defendants apparently argued that the district court lacked jurisdiction over the case because the United States Treasury might be the ultimate source of funds from which HUD would satisfy a money judgment entered against it. The Court of Appeals declined to accept this reasoning and instructed the district court that

> [i]f the [district] court determines that HUD is liable for the arbitration award, it need not engage in a further analysis of the source of the funds that would be used to satisfy its judgment—*i.e.*, from general Treasury funds or funds within the discretion and control of the Secretary. The court should simply direct the Secretary to satisfy the judgment out of the funds that are within his control, assuming, of course, that such funds exist. It is only as to such funds that the Secretary's immunity has been waived.

*Id.* at 120. Thus, it is clear that as long as the United States is not the immediate source of funds from which an agency pays out a money judgment, a suit against the

agency will not be considered to be a suit against the United States [5]. Accordingly, defendants' argument that this Court does not have jurisdiction over plaintiffs' suit against the FDIC must fail.

## II. THE MERITS

Having found jurisdiction over plaintiffs' claims against OTS and the FDIC, we now turn to the question of whether plaintiffs have stated claims upon which relief can be granted. We will discuss each count of plaintiffs' complaint *seriatim*.

### a. Count I

Plaintiffs maintain in count I that FIRREA does not authorize defendants to abrogate the forbearance agreements, and that if FIRREA does authorize this abrogation, then FIRREA and the conduct of the defendants thereunder would constitute a taking of property without due process of law in violation of the fifth amendment of the United States Constitution.

#### 1. Effect of FIRREA on the Forbearance Agreements

■ Defendants argue that not only does FIRREA permit them to abrogate the forbearance agreements, but FIRREA mandates that they do so, and requires defendants to apply FIRREA's capital requirements and goodwill accounting provisions to all thrifts uniformly [6]. To support

---

**5.** That the FDIC can, upon request, compel the treasury to pay money into the resolution fund does not change this analysis. Under *Sanders*, the FDIC will only "be obliged to satisfy the judgment out of non-Treasury funds that are available to [it], if any. If no such funds are available, [i.e., there are no funds in the resolution fund at the time the plaintiffs execute a judgment against the FDIC] the [FDIC] will have no payment obligation." *C.H. Sanders Co. v. BHAP Housing Development Fund Co.*, 910 F.2d 33, 33 (2d Cir.1990).

**6.** FIRREA makes two exceptions to this uniformity requirement.

First, FIRREA allows thrifts not in compliance with FIRREA's minimum capital requirements to apply to the Director of OTS for "an exemption from any applicable sanction or penalty which the Director [of OTS] may impose." 12 U.S.C.A. § 1464(t)(7)(A). While the director of OTS may grant a bank this exemption, FIRREA still requires the director to place severe restrictions on the bank's asset growth. *See* 12

U.S.C.A. §§ 1464(t)(7)(B), 1464(t)(6)(A), 1464(t)(6)(B). "[T]hese operating limits are so burdensome [that] this grant of discretion is not sufficient to allow [ ] OTS to preserve the expectations of thrifts with forbearance agreements." David Toscano, Note, *Forbearance Agreements: Invalid Contracts for the Surrender of Sovereignty*, 92 Colum.L.Rev. (forthcoming March 1992).

Second, in § 302 of FIRREA, 12 U.S.C.A. § 1467a (Note), "Congress exempted from the newly-enhanced capital requirements those thrifts with 'capital restoration plans' previously approved under Section 404 of the Competitive Equality Banking Act of 1987 ("CEBA") (Pub.L. No. 100–86, 101 Stat. 552, 554, 609–13)...." *Defendants' Memorandum in Support of their Motion to Dismiss.* Plaintiffs do not claim that this exemption applies to them.

Finally, while § 1464(s)(2) provides that the director of OTS may determine minimum capital levels for thrifts on a case by case basis, this provision states that the director must make these determinations consistent with subsection

their position defendants point out that FIRREA phases out thrifts' use of supervisory goodwill as an asset over three years, 12 U.S.C. § 1464(t)(3)(A), and requires goodwill to be excluded from the satisfaction of FIRREA's tangible capital requirements, 12 U.S.C. § 1464(t)(9)(C). In addition, defendants argue that because Congress specified the circumstances in which thrifts could be exempted from FIRREA's enhanced capital requirements, *see* 12 U.S.C. § 1467a (note) (section 302), Congress must have intended FIRREA's capital requirements to be applied in all other cases. In making this argument the defendants rely on the statutory maxim *expressio unius est exclusio alterius. See TVA v. Hill,* 437 U.S. 153, 188, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117 (1978); *In re Cash Currency Exchange, Inc.,* 762 F.2d 542, 552 (7th Cir.) ("the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded."), *cert. denied sub nom. Fryzel v. Cash Currency Exchange, Inc.,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985).

To further support their position that FIRREA mandates that they abrogate the forbearance agreements, defendants point to 12 U.S.C. §§ 1464(s)(1), 1464(s)(3) and 1464(t)(1)(A). Section 1464(s)(1) provides that "the Director shall require *all* savings associations to achieve and maintain adequate capital...." (emphasis added). Section 1464(s)(3) provides that "the Director may treat the failure of *any* savings association to maintain capital at or above the minimum level required ... as an unsafe or unsound practice." (emphasis added). Finally, § 1464(t)(1)(A) provides that "[t]he Director shall, by regulation, prescribe and maintain *uniformly applicable* capital standards for savings associations." (emphasis added).

Perhaps defendants' strongest argument supporting their contention that FIRREA mandates that defendants abrogate the forbearance agreements, can be found in FIRREA's legislative history. That history includes statements by those who supported and opposed FIRREA declaring that FIRREA, unamended, would do away with the forbearance agreements. *See Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994, 1004–1005 (11th Cir.1991). Moreover, the legislative history also includes proposed, but unenacted amendments that would have ameliorated the effect of the supervisory-goodwill phaseout on banks with whom the United States had forbearance agreements. *See Far West,* 951 F.2d at 1098; *Guaranty Financial,* 928 F.2d 994 at 1003–1006; *Franklin Federal Savings Bank v. Office of Thrift Supervision,* 927 F.2d 1332 at 1338–1341 (6th Cir.1991). This history suggests that Congress intended and understood the unamended act to abrogate the forbearance agreements.

Plaintiffs, on the other hand, argue that "[i]t is a cardinal principle of statutory construction that a statute will not be read to repudiate pre-existing contractual obligations unless the language of the statute unequivocally requires that result." Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss at 56. Plaintiffs' maintain that FIRREA does not explicitly abrogate the forbearance agreements and that therefore FIRREA should not be read to do so. *See, e.g., Carteret Savings Bank, FA v. Office of Thrift Supervision,* 762 F.Supp. 1159, 1176–77 (D.N.J.1991). We disagree. We believe that when FIRREA's statutory language is read in light of FIRREA's legislative history, it becomes clear that Congress intended to abrogate the forbearance agreements. Accordingly, we find that FIRREA abrogated the forbearance agreements [7].

(t). As discussed above, subsection (t)'s capital requirements appear to make it impossible for OTS to honor its forbearance agreements with plaintiffs. Therefore, § 1464(s)(2) provides no relief for the plaintiffs in the instant case. *See* Toscano, *supra.*

**7.** The Court in *Carteret* argued that "[no] amount of legislative history [can] overcome the requirement that elimination of contractual rights must be done clearly and unequivocally...." *Carteret,* 762 F.Supp. at 1179. The *Carteret* Court, however, did not cite any case authority for this proposition, and we are reluctant to rule as a matter of law that legislative history can never decisively indicate Congress's intention to abrogate contractual rights in the absence of explicit language in a statute.

■ Plaintiffs further argue that their forbearance agreements with the FHLBB are "obligations" within the meaning of FIRREA § 401(g) and are "resolutions" within the meaning of § 401(h). Plaintiffs maintain that because §§ 401(g) and (h) preserve the validity of the FHLBB's "obligations" and "resolutions," these sections preserve the validity of the forbearance agreements that plaintiffs had with the FHLBB before it was abolished by FIRREA. Sections 401(g) and (h) provide:

**(g) Savings provisions relating to FHLBB.—**

**(1) Existing rights, duties, and obligations not affected.**—Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—

**(A)** arises under or pursuant to the Federal Home Loan Bank Act [this chapter], the Home Owners' Loan Act of 1933 [12 U.S.C.A. § 1461 *et seq.* ], or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act) [12 U.S.C.A. § 1724 *et seq.* ], and

**(B)** existed on the day before the date of the enactment of this Act [Aug. 9, 1989].

. . . .

**(h) Continuation of orders, resolutions, determinations, and regulations.**—Subject to section 402, all orders, resolutions, determinations, and regulations, which—

**(1)** have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board (including orders, resolutions, determinations, and regulations which relate to the conduct of conservatorships and receiverships), or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act [Pub.L. 101–73]; and

**(2)** are in effect on the date this Act takes affect [Aug. 9, 1989],

shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board, or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law by the Director of the Office of Thrift Supervision, the Federal Deposit insurance Corporation, the Federal Housing Finance Board, or the Resolution Trust Corporation, as the case may be, by any court of competent jurisdiction, or by operation of law.

Plaintiffs rely on a number of district court opinions to support their interpretation of §§ 401(g) and 401(h), but these decisions have all been explicitly or implicitly reversed or overruled by subsequent circuit court decisions. *See Franklin Federal Savings Bank v. Director, Office of Thrift Supervision,* 1990 WL 123145 (E.D.Tenn. 1990), *rev'd,* 927 F.2d 1332 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991); *Guaranty Financial Services, Inc. v. Ryan,* 742 F.Supp. 1159 (M.D.Ga.1990), *rev'd,* 928 F.2d 994 (11th Cir.1991); *Sterling Savings Ass'n v. Ryan,* 751 F.Supp. 871 (E.D.Wash.1990) (implicitly overruled by *Far West Federal Bank v. Director, Office of Thrift Supervision,* 951 F.2d 1093 (9th Cir.1991)); *Security Federal Savings Bank v. Director, Office of Thrift Supervision,* 747 F.Supp. 656 (N.D.Fla. 1990) (implicitly overruled by *Guaranty Financial Services* ); *Far West Federal Bank v. Director, Office of Thrift Supervision,* 738 F.Supp. 1559 (D.Or.1990) (implicitly overruled by *Far West* ).

Defendants maintain that § 401(g) was intended only "to [prevent] the agreements that the FSLIC and the FHLBB entered into ... from being terminated merely because one of the contracting parties, the FSLIC or the FHLBB, cease[d] to exist." Defendants' Brief in Support of its Motion to Dismiss at 48. At least three circuit courts have accepted the defendants' interpretation of this section. *Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision,* 951 F.2d at 1098 (reversing preliminary injunction); *Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d at

1003–1006 (reversing preliminary injunction); *Franklin Federal Savings Bank v. Director, Office of Thrift Supervision,* 927 F.2d at 1338–1341 (reversing preliminary injunction). These courts have reasoned that

> [b]y Section 401(g)'s terms, it is concerned only with the effect of subsection (a), which eliminates the Bank Board and the FSLIC. If Congress meant Section 401(g) to protect the abolished agencies' contracts from the effect of every part of FIRREA, it expressed its intention inartfully, to say the least.
>
> The language of Section 401(g) does not clearly convey a congressional intention to qualify the phase-out of supervisory goodwill or any of the other new capital standards. It seems to us that the injury that [plaintiffs] complain[] of is not the result of subsection (a). If Congress had not included the supervisory goodwill phase-out in FIRREA, Guaranty would have suffered no injury. But if Congress had included the phase-out but not abolished the Bank Board and the FSLIC, [plaintiffs] would be in the same predicament [they are] now. This suggests to us that the possible loss of [plaintiffs'] supervisory goodwill forbearance is the result not of the abolition of the agencies, but of the new capital standards, and that a savings provision that says that the abolition of the agencies "shall not affect the validity of any right, duty, or obligation" is inapplicable to [plaintiffs'] situation.

*Guaranty Financial,* 928 F.2d at 1003; *accord Far West,* 951 F.2d at 1098; *Franklin Federal,* 927 F.2d at 1338–1339. The eleventh circuit has determined that this explanation applies to § 401(h) as well. *See Guaranty Financial,* 928 F.2d at 1003 ("We think it quite possible that with Section 401(g)—*and its companion provisions protecting the FSLIC's contracts, as well as the regulatory acts of the Bank Board and the FSLIC*—Congress merely intended to prevent a vacuum of authority that could potentially destabilize an already shaky industry." (emphasis added)). We agree with these courts, and hold that §§ 401(g) and (h) do not prevent the for-bearance agreements from being terminated.

In light of the foregoing, we conclude that FIRREA not only permits, but mandates defendants to abrogate the forbearance agreements they have with plaintiffs.

### 2. Due Process Claims

 Assuming, without deciding, that defendants' abrogation of the forbearance agreements constitutes a taking of property within the meaning of the fifth amendment, defendants' action is not, as a matter of law, violative of due process of law. "In general, legislation that effects a taking will not be held unconstitutional because there is usually some forum in which an injured party can assert his claim, such as the [Claims Court] under the Tucker Act." *Morgan Guaranty Trust Co. of New York v. Republic of Palau,* 680 F.Supp. 99, 105 (S.D.N.Y.1988); *see Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision,* 951 F.2d at 1100 (not reaching the question of whether abrogation of forbearance agreements was a taking because, *inter alia,* a remedy for the taking, if one occurred, was available in the Claims Court); *cf. Bartlett v. Bowen,* 816 F.2d 695, 703–710 (D.C.Cir.1987) (a bar of all judicial review of a federal statute would violate due process). In the instant case, because "[t]here is no indication in FIRREA [that] Congress intended to withdraw the jurisdiction of the [Claims Court]," *Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision,* 951 F.2d at 1100, plaintiffs can bring their takings claim in that forum.

 Moreover, " '[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court[s] with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.' " *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984) (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752

(1976)). In addition, " 'legislation adjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.' " *Id.* (quoting *Usery*, 428 U.S. at 16, 96 S.Ct. at 2893). In the instant case, Congress passed FIRREA for the rational purpose of broadly protecting investors, promoting the health of the thrift industry, and staunching immense fiscal damage to the nation's treasury. Because plaintiffs have failed to allege that Congress' passage of FIRREA was irrational or arbitrary, FIRREA and the activities of the defendants thereunder, are not violative of due process. Accordingly, count I of the complaint is dismissed.

### b. *Count II*

■ In count II of the complaint, plaintiffs assert that the purposes of the contracts have been frustrated, that there has been a failure of consideration, and that rescission is therefore required. Plaintiffs' brief argues that this Court should also rescind the contracts because Congress made the performance of the contracts impossible by the enactment of FIRREA, a theory unarticulated by plaintiffs in their complaint. *See* Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss at 48.

> The Second Circuit has stated that [f]rustration of purpose ... focuses on events which materially affect the consideration received by one party for his performance. Both parties can perform but, as a result of unforeseeable events, performance by party *X* would no longer give party *Y* what induced him to make the bargain in the first place. Thus frustrated, *Y* may rescind the contract. Discharge under this doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.

*United States v. General Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir.1974). Though plaintiffs' frame their claim under this count as one of frustration, they do not assert that both parties can perform the contract. On the contrary, they assert that because defendants will not honor the forbearance agreements, plaintiffs cannot perform their part of the contract, *i.e.,* to resuscitate the three insolvent thrifts. Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss at 50. Therefore, plaintiffs claim is more correctly analyzed under the doctrine of impossibility than under the doctrine of frustration of purpose.

■ The second circuit has also stated that

> impossibility may be equated with an inability to perform as promised due to intervening events, such as an act of state or destruction of the subject matter of the contract. The doctrine comes into play where (1) the contract does not expressly allocate the risk of the event's occurrence to either party, and (2) to discharge the contractual duties (and, hence, obligations to pay damages for breach) of the party rendered incapable of performing would comport with the customary risk allocation. Essentially, then, discharge by reason of impossibility—as well as the concomitant remedy (to the discharge) of rescission—enforces what can reasonably be inferred to be the intent of the parties at the time of the contract.

*Douglas MacArthur*, 508 F.2d at 381. In the instant case, it is impossible for defendants to perform their part of the bargain, *i.e.,* to honor the forbearance agreements, because FIRREA forbids them to do so. Moreover, the forbearance agreements do not expressly allocate the risk of changes in the law to either party. Thus, the question essentially becomes, upon whom is the risk of statutory change customarily placed?

> At least one court has held that [w]hen a government agency enters into an agreement with another party that calls for a specific use of its executive powers, it is presumed, unless their is evidence to the contrary, that the parties did not intend either party to assume the risk that the agency would not continue to have the authority to make such use of its powers in the foreseeable future.

**406**

*Charter Federal Savings Bank v. Director, Office of Thrift Supervision,* 773 F.Supp. 809, 825 (W.D.Va.1991). Moreover, it is fair to presume that when a promisor enters into a contract, it believes that the best remedy it can get if performance becomes impossible is rescission and restitution. *Id.* Therefore, we believe that plaintiffs' impossibility argument states a claim upon which relief can be granted, and, accordingly, we decline to dismiss count II of the complaint.

■ Furthermore, we find that count II of plaintiffs' complaint also adequately states a claim against defendants based on failure of consideration. Professor Williston has stated that "[f]ailure of consideration exists whenever one who has promised to give some performance fails without his fault to receive in some material respect the agreed exchange for that performance." *Williston on Contracts* § 814 at pp. 12–14. "Failure of consideration ... gives the disappointed party a right to rescind the contract" and "it is immaterial whether the failure is due to fraud, mistake, impossibility, or willful breach of promise." *Id.* at 19, 15–16. In the instant case, as consideration for plaintiffs' taking over three failing thrifts, the FHLBB and the FSLIC promised to count supervisory goodwill as an asset in all of the plaintiffs' capital calculations. The action mandated upon OTS pursuant to FIRREA makes it impossible for defendants to provide this consideration to plaintiffs.

■ We observe that *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), under which defendants argue that plaintiffs should bear the burden of the changed law because " '[t]hose who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end,' " *id.* at 227, 106 S.Ct. at 1027 (quoting

*FHA v. Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)), is inapposite. In the statute construed in *Connolly,* Congress was concerned with the withdrawal of employers from pension plans, and passed legislation which mandated that employers continue contributing to the plans even after they withdrew from such plans. When the employers complained that the new statute constituted a taking of property without due process of law, the Supreme Court made the statement upon which the defendants rely. It is evident that the specific purpose of the statute in *Connolly* was to prevent employers from withdrawing from the pension plans, and to have allowed the plaintiffs in that case to withdraw from those plans would have directly contravened Congress' express intent. By contrast, in this case, though we have found that Congress mandated the abrogation of the forbearance agreements, "there is nothing in the record, defendants' arguments, or the legislative history of FIRREA that suggests that [rescinding the contract and granting declaratory relief] would violate a policy of Congress." *Charter Federal Savings Bank v. Director, Office of Thrift Supervision,* 773 F.Supp. at 827. Accordingly, *Connolly* would not prohibit this Court from granting plaintiffs the relief that they seek in this complaint. *See id.* at 826–27 [8].

■ Defendants also unconvincingly argue that plaintiffs' contract claims are barred by the Sovereign Acts Doctrine. That Doctrine provides that when the United States is a contracting party, it " '[is] to be held liable [on the contract] only within the same limits that any other defendant would be in any other court. Though [its] sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.' " *Horowitz v. United States,* 267

---

**8.** "Defendants want th[is] court to apply a double standard by which they become the privileged party. Defendants want to be able to rescind and be absolved of their obligation to treat goodwill according to the accounting plans that the FHLBB approved; but they want plaintiff[s] to be forced to possess the liabilities of

the acquired thrifts and suffer the consequences of noncompliance with OTS's new capital standards. In the absence of clear evidence to the contrary, this court does not believe the parties intended such a result when they made their agreement[s]." *Charter Federal Savings Bank,* 773 F.Supp. at 825.

U.S. 458, 461, 45 S.Ct. 344, 345, 69 L.Ed. 736 (1925) (quoting *Jones v. United States,* 1 Ct.Cl. 383, 384 (1865)). Thus, for example, the United States as a party to a contract cannot be held liable for the fact that a law that it passed in its sovereign capacity makes the other contracting party's performance of the contract more expensive. *See, e.g., Tony Downs Foods Co. v. United States,* 530 F.2d 367, 209 Ct.Cl. 31 (1976) (granting the government immunity from liability where Executive Order lifting price freeze on turkeys caused monetary loss to party contracting with the Department of Agriculture). However, the Sovereign Acts Doctrine does not forbid courts from excusing private parties who contract with the government from further performance under the contract when the government's sovereign act makes the performance of the contract impossible. In *Wah Chang Corp. v. United States,* 282 F.2d 728, 151 Ct.Cl. 41 (1960), a private party's performance of its contract with the government became more expensive because the government condemned the party's factory. *Id.* 282 F.2d at 733. Though the Court of Claims held that the party was barred by the Sovereign Acts Doctrine from succeeding in its breach of contract claim against the United States, *id.* at 733–35, the Court stated in *dictum* that the private party "would have been justified in ceasing its ... operations when the condemnation proceedings were initiated." *Id.* at 733. This reasoning makes sense when one considers that the Sovereign Acts Doctrine requires that a court treat the United States in the same way that it would treat a private party to a contract in similar circumstances. While a private party would not be liable for breach of contract if the United States were to pass a statute that made performance of the contract impossible, the second party to the contract would be able to rescind the contract without penalty. *See Cook v. El Paso Natural Gas Co.,* 560 F.2d 978, 982 (10th Cir.1977); *Charter Federal Savings Bank v. Director, Office of Thrift Supervision,* 773 F.Supp. 809, 824 (W.D.Va.1991); II ·E. Allan Farnsworth,

*Farnsworth on Contracts,* § 9.5 at 534–35 (1990). Similarly, while the United States cannot be sued for breach of contract if it passes a statute that makes performance of the contract impossible, the private party contracting with the United States may rescind the contract in· these circumstances. Thus, plaintiffs' claim for rescission of the contracts and for declaratory relief is not barred by the Sovereign Acts Doctrine.

In sum, then, as we have said, count II of plaintiffs complaint states a claim upon which relief may be granted.

#### c. Count III ·

■ In count III of their complaint plaintiffs claim that defendants' failure to honor the forbearance agreements constitutes breach of contract. Because FIRREA made the defendants' performance of the contract impossible they are not liable for breach. *See* above. In addition, as we have already found, the Sovereign Acts Doctrine shields defendants from liability for passing a statute that makes the defendants' performance of the contracts impossible. Accordingly, count III of the complaint is insufficient as a matter of law, and is dismissed.

#### d. Count IV

■ In count IV plaintiffs explicitly contend that defendants are prevented by promissory estoppel from abrogating their forbearance agreements with plaintiffs. Curiously, plaintiffs now maintain in their briefs that although the language of the complaint states otherwise, the complaint does not assert promissory estoppel against the government but "merely asserts one more equitable consideration justifying rescission and a declaration of unenforceability." Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss at 71. Plaintiffs do not cite any cases to support the notion that this equitable consideration can independently state a claim upon which relief can be granted, and therefore count IV is dismissed [9].

---

9. Even if we were to construe count IV as asserting equitable estoppel as opposed to promis-

sory estoppel against the defendants, count IV would not state a claim upon which relief can

### e. Count V

 In count V of plaintiffs' complaint, plaintiffs contend that defendants' failure to honor the forbearance agreements is an unlawful taking of plaintiffs' contract rights within the meaning of the fifth amendment of the United States constitution. For the reasons stated in part II(a) of this opinion, count V is dismissed.

### Conclusion

Defendants' motion to dismiss the complaint is granted in part and denied in part. Counts I, III, IV, and V are dismissed. Plaintiffs may go forward on count II.

SO ORDERED.

---

be granted. "Estoppel is permitted against an agency of the United States only if there has been affirmative, serious misconduct by a government agent upon which a party reasonably relied to its detriment." *FHM Constructors, Inc. v. Village of Canton Housing Auth.,* 779 F.Supp. 677, 682 (N.D.N.Y.1992); *Diamond v. Federal Emergency Management Agency,* 689 F.Supp. 163, 169–70 (E.D.N.Y.1988); *Cook v. Pension Benefit Guar. Corp.,* 652 F.Supp. 1085, 1090–91 (S.D.N.Y.1987); *see also Heckler v. Community Health Services,* 467 U.S. 51, 60, 104

S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("[I]t is well settled that the government may not be estopped on the same terms as any other litigant."); *United States v. RePass,* 688 F.2d 154, 158 (2d Cir.1982) ("Equitable estoppel as a defense is not available against the United States, except in the most serious circumstances." (citations omitted)). In the instant case, plaintiffs have not alleged any affirmative, serious misconduct by any of the defendants, and therefore an equitable estoppel claim must fail.