FAR WEST FEDERAL BANK, S.B., Trinity Ventures, Ltd., U.S. Venture Partners III, U.S.V. Entrepreneur Partners, et al., Plaintiffs–Appellees,

v.

DIRECTOR, OFFICE OF THRIFT SUPERVISION, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board, Federal Home Loan Bank of Seattle, and Federal Deposit Insurance Corporation, in its own Capacity and as Successor in Interest to the Federal Savings and Loan Insurance Corporation, Defendants–Appellants.

No. 90–35752.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 7, 1991.

Decided Dec. 17, 1991.

---

Aaron B. Kahn, Sp. Counsel, Office of Thrift Supervision, Washington, D.C., Scott R. McIntosh, Appellate Staff Civ. Div. U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

John C. Millian and Wesley G. Howell, Jr., Gibson, Dunn & Crutcher, Washington, D.C., for plaintiffs-appellees.

Before BROWNING, CANBY and TROTT, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989), in part to deal with financial problems of federally chartered thrift institutions. The question presented by this case is whether provisions of FIRREA establishing stricter capital requirements for thrifts and stricter limits on the amount a thrift may loan to a single customer superseded an earlier agreement by the Federal Home Loan Bank Board (Bank Board) to subject Far West Federal Bank to more lenient requirements. The district court held they did not.[1] We reverse.

## I

Beginning in the early 1980s, Far West, a thrift institution headquartered in Portland, Oregon, suffered major financial losses. By the end of 1986, Far West had a negative net worth. A group of investors was found who were willing, under certain conditions, to supply Far West with new capital. In 1987, following discussions among the investors group, Far West, the Bank Board and the Federal Home Loan Bank of Seattle (FHLB—Seattle), several related actions were taken. The Bank Board approved conversion of Far West from a mutual savings association to a stock savings association. The Board issued a "forbearance letter" granting Far West freedom for 10 years from the regulatory capital requirements then set forth in 12 C.F.R. 563.13 (1987), and entered into a "conversion agreement" with Far West establishing a less stringent "Modified Regulatory Capital Requirement" to be observed by Far West during the 10 year period. FHLB—Seattle agreed to provide Far West with a $1.5 billion "credit facility" (line of credit) and the Bank Board agreed the value of the credit facility could be amortized on a straight-line basis over a 25 year period in determining Far West's compliance with the "Modified Regulatory Requirements." The Board also agreed to waive normal growth limitations, and to treat the government credit facility as an intangible asset included in calculating Far West's regulatory capital, allowing Far West to operate with less of its own capital than otherwise would have been required and to make the relatively large loans considered necessary to the success of Far West's plan to regain solvency. The investors group then advanced $27 million in return for Far West stock.

Far West operated under these arrangements for about two years, successfully we are told, until FIRREA became law. FIRREA mandated substantially more stringent capital standards for thrifts. The Office of Thrift Supervision (OTS), created by FIRREA to replace the Bank Board,[2] issued regulations implementing the new capital requirements, see 54 Fed.Reg. 46,845 (1989), and announced that FIRREA's capital standards provisions had abrogated existing capital forbearances agreed to by the Bank Board, see Thrift Bulletin 38–2. The regulations did not allow savings institutions to use government financial assistance, like the Far West credit facility provided by FHLB—Seattle, to meet the new capital requirements. OTS also insisted FIRREA had changed the rules regarding limits on loans to one borrower, by excluding "intangible assets" from the calculation

---

1. The relevant opinions of the district court are reported at 738 F.Supp. 1559 (D.Or.1990), 738 F.Supp. 1564 (D.Or.1990) and 746 F.Supp. 1042 (D.Or.1990).

2. Section 401(a)(2), 103 Stat. 354 abolished the Bank Board and § 301, 103 Stat. 278 (codified at 12 U.S.C. § 1462a) created OTS.

All citations to FIRREA are first to the original sections of Pub.L. No. 101–73 (1989), then to the relevant page(s) of 103 Stat. and then to the U.S.C. cite, if any.

of such limits—contrary to the conversion agreement between Far West and the government which had allowed intangible assets, like the credit facility, to be included in the calculation. The result was to restrict the size and kind of loans Far West could make.

OTS directed Far West to submit a plan for complying with the new standards. Far West instead submitted a plan based on the conversion agreement, which OTS rejected. Because of Far West's failure to comply with the new standards, OTS imposed growth and operating restrictions on the bank and asked Far West to authorize OTS to merge, reorganize or otherwise obtain a capital infusion for Far West.

Far West and its investors filed suit against OTS and another regulatory agency, the Federal Deposit Insurance Corporation.[3] Counts I and II of the five-count complaint sought declaratory and injunctive relief barring OTS and FDIC from interfering with the performance of the conversion agreement: Count I on the premise that, as a matter of statutory interpretation, FIRREA's stricter standards did not supersede the conversion agreement; Count II on the premise that the Fifth Amendment barred OTS from applying the new standards to Far West to the extent they were inconsistent with the conversion agreement. The district court entered a declaratory judgment and a permanent injunction in favor of Far West on these two counts, preventing enforcement of the new standards against Far West. OTS and FDIC appeal.

■ Count III of the complaint was voluntarily dismissed. Counts IV and V of the complaint were based on the premise FIRREA *did* supersede the conversion agreement. Count IV sought rescission of the conversion agreement and restitution of the funds contributed by Far West investors. This count is still pending in the district court. Count V sought just compensation, pursuant to the fifth amendment, for a taking of Far West's "property." This count was voluntarily dismissed so that it might be refiled in the Claims Court; however, no refiling has yet occurred.[4]

---

3. Prior to FIRREA, the Federal Savings and Loan Insurance Corporation was charged with insuring accounts at thrift institutions such as Far West. FIRREA abolished the Federal Savings and Loan Insurance Corporation, § 401(a)(1), 103 Stat. 354, and essentially transferred its functions and responsibilities to the FDIC.

4. OTS and FDIC moved to dismiss this appeal and vacate the judgment below because, while *the appeal was pending,* Far West was placed in receivership and its operating assets transferred to a newly created savings association. Since Far West no longer owns a functioning thrift institution, the permanent injunction serves no purpose as to Far West. The new savings association was not a party to the suit and is not protected by the injunction. Both sides agree the injunction, therefore, should be dissolved.

However, this appeal still presents a live controversy as to whether FIRREA superseded the Far West conversion agreement. The district court issued a declaratory judgement that it did not. The effect our decision on this issue will have on the remaining litigation between the parties prevents this appeal from becoming moot. *See Trans Int'l Airlines, Inc. v. Int'l Bhd. of Teamsters,* 650 F.2d 949, 955 (9th Cir.1980). If FIRREA did supersede the conversion agreement, Far West may go forward on Count IV

and perhaps Count V of its complaint. Further, we cannot rule out the possibility Far West investors would be entitled to damages if the actions taken by OTS were unauthorized. *See Z Channel Ltd. v. Home Box Office,* 931 F.2d 1338, 1340–41 (9th Cir.1991).

Appellants argue the appeal is moot because the declaratory judgment was binding only on OTS, while the pending claims of the Far West investors are directed against FDIC. However, OTS is named as a defendant in all counts of Far West's complaint. Whether FDIC is a party to the declaratory judgment, and whether any eventual recovery would come from FDIC, rather than OTS, is not before this court.

Vacating the entire judgment below would require the parties to relitigate an issue the district court has already decided. Dismissing the appeal, while leaving the district court judgment intact, as requested by appellees, would deprive appellants of the opportunity for appellate review as well as raise questions as to the preclusive effects of the unreviewed judgment. Delaying a decision pending the outcome of the remaining litigation between the parties, instead of deciding it now, would result in a substantial waste of judicial resources. We conclude the issue is ripe for review. *See Sea–Land Service, Inc. v. International Longshoremen's and Warehousemen's Union,* 939 F.2d 866, 870–71 (9th Cir.1991) (discussing standards for "ripeness").

## II

The parties agree Congress had the power to supersede forbearances on minimum capital standards and less strict limitations on loans to one borrower found in the Far West conversion agreement.[5] They disagree on whether Congress, in passing FIRREA, did so. If FIRREA superseded these prior arrangements, OTS had authority to apply the disputed standards to Far West.

### A

■ FIRREA was passed "[t]o improve the supervision of savings associations by strengthening capital, accounting and other supervisory standards," to "strengthen the enforcement powers of Federal regulators of depository institutions," and generally to "promote, through regulatory reform, a safe and stable system of affordable housing finance." § 101(1), (2), (9), 103 Stat. 187. Clearly this purpose would be served by interpreting the statute as abrogating prior agreements authorizing less demanding capital requirements and operating standards. The language and structure of FIRREA support the same construction.

FIRREA provides, *inter alia*, that the Director of OTS is required by regulation to "prescribe and maintain uniformly applicable capital standards for savings associations," § 301, sec. 5(t)(1)(A), 103 Stat. 303, 12 U.S.C. § 1464(t)(1)(A), which must include leverage limits, tangible capital requirements and risk-based capital requirements. The statute specifies the percentages of assets required under each capital standard. No savings association is in compliance with the capital standards unless it complies with all three. § 301, sec.

5(t)(1)(B), 103 Stat. 304, 12 U.S.C. § 1464(t)(1)(B). The statute authorizes the imposition of draconian sanctions upon noncomplying thrifts. § 301, sec. 5(t)(6), 103 Stat. 307–08, 12 U.S.C. § 1464(t)(6).

The requirements are generally stated; no exceptions based on prior Bank Board agreements are provided. Section 301 does, however, specify three other exceptions. Section 301, sec. 5(t)(6)(C), 103 Stat. 308, 12 U.S.C. § 1464(t)(6)(C), allows a noncomplying thrift to increase its assets if it meets certain requirements. Section 301, sec. 5(t)(7), 103 Stat. 308–09, 12 U.S.C. § 1464(t)(7) allows noncomplying thrifts to apply for exemption from all applicable standards, except the growth limitation, and provides standards for approving or denying an application for such an exemption. Until January 1991, OTS also could grant an exception to the capital standards themselves under § 301, sec. 5(t)(8), 103 Stat. 309–10, 12 U.S.C. § 1464(t)(8).[6]

Far West argues the recognition of specific exceptions indicates Congress did not intend complete uniformity in capital requirements. The generally accepted principle of statutory construction, however, is that when Congress explicitly enumerates exceptions to a general scheme, exceptions not explicitly made should not be implied, absent evidence of contrary legislative intent. *Andrus v. Glover Construction Co.*, 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980); *See also In re Gerwer*, 898 F.2d 730, 732 (9th Cir.1990).

It is clear Congress was aware of the possibility of including a clause in the portion of the statute dealing with thrifts that would preserve prior agreements. Section

---

**5.** The parties disagree on whether the conversion agreement governed calculation of loans-to-one-borrower limitations. *See* section II D of this opinion.

**6.** Section 301, sec. 5(s), 103 Stat. 302–03, 12 U.S.C. § 1464(s) entitled "Minimum Capital Requirements", states at (1) that "the Director [of OTS] shall require all savings associations to achieve and maintain adequate capital by ... establishing minimum levels of capital for savings associations." This general rule is followed by a subsection allowing the Director to vary the required minimum levels where necessary

or appropriate, if consistent with subsection (t), *see* § 301, sec. 5(s)(2), 103 Stat. 303, 12 U.S.C. § 1464(s)(2), and another subsection leaving to the discretion of the Director the decision whether a failure to comply with minimum capital levels should be considered an unsafe or unsound practice, § 301, sec. 5(s)(3), 103 Stat. 303, 12 U.S.C. § 1464(s)(3). Thus, FIRREA's treatment of minimum capital requirements, like its treatment of capital standards, is in the form of a general rule followed by specific exceptions.

302 of FIRREA contains an express savings clause applicable to some pre-FIRREA agreements between thrifts and the Federal Home Loan Bank Board, although not the Far West conversion agreement.[7] The presence of this carefully drawn savings clause in the same portion of the statute strongly supports the government's argument that the omission of an exemption for forbearance agreements such as that between Far West and the Bank Board was deliberate.

### B

■ Far West argues, and the district court held, that Congress *did* insert a savings clause that preserves the capital forbearances in the Far West conversion agreement-section 401(g) of FIRREA, which is found in Title IV, dealing with "Transfer of Functions, Personnel, and Property." Section 401(g) provides:

> (1) Existing rights, duties and obligations not affected.—Subsection (a) [abolishing FHLBB] shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board ... and
>
> (B) existed on the day before the date of the enactment of this Act.

103 Stat. 356–57. The district court concluded section 401(g) covers the forbearances in the Far West conversion agreement by its plain language, and reasoned that "[i]f FIRREA abrogates all existing con-

tracts that bound the United States before its enactment, section 401(g) would be surplusage, utterly without purpose." *Far West,* 738 F.Supp. at 1563.

The government argues section 401(g) was intended only to preserve contracts that might otherwise lapse automatically through abolition of the Bank Board and transfer of its functions to OTC, not to exempt Far West and other thrifts from new substantive requirements of FIRREA. The Sixth and Eleventh Circuits have agreed with the government, pointing out that the language of the section, the structure of the statute, and the legislative history strongly support OTS's interpretation of section 401(g). *See Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994, 1003–1006 (11th Cir.1991); *Franklin Federal Savings Bank v. Director, OTS,* 927 F.2d 1332, 1338–1341 (6th Cir.1991). For the reasons detailed in the exhaustive opinions of the Sixth and Eleventh Circuits, we also agree with OTS's interpretation. No useful purpose would be served by repeating that analysis here.

### C

Far West argues section 501(a) of FIRREA establishes that Congress did not intend to abrogate existing forbearance agreements. This section directs the Resolution Trust Corporation, created by FIRREA to supervise receiverships, to review insolvency cases resolved between January 1, 1988 and the enactment of FIRREA, to review the costs under existing agreements in such cases, and to "modify, renegotiate, or restructure such agreements where savings would be realized."[8] Because the con-

---

7. *Section 302 provides:*

> Notwithstanding the amendment made by this title to section 10 of the Home Owners' Loan Act and the repeal of section 416 of the National Housing Act—
>
> (1) any plan approved by the Federal Home Loan Bank Board under such section 10 ... shall continue in effect as long as such association adheres to the plan and continues to submit to the Director of the Office of Thrift Supervision regular and complete reports on the association's progress in meeting the savings association's goals under the plan....

§ 302, 103 Stat. 343.

8. Section 501(a), 103 Stat. 363–93, 12 U.S.C. § 1441a directs the Resolution Trust Corporation to:

> (i) review and analyze all insolvent institution cases resolved by the Federal Savings and Loan Insurance Corporation between January 1, 1988 and the date of enactment of [FIRREA], and actively review all means by which it can reduce costs under existing Federal Savings and Loan Insurance Corporation agreements relating to such cases, including restructuring such agreements;

version agreement between Far West and the Board was signed at the end of 1987, prior to the period to which this section applies, and because the section refers only to the Resolution Trust Corporation and not to OTS, the section by its terms does not apply to the Far West conversion agreement. However, Far West argues the Congressional directive embodied in section 501(a), requiring reevaluation of some pre–FIRREA agreements, necessarily implies that such agreements were not abrogated by FIRREA. But OTS does not contend that all pre–FIRREA agreements were abrogated in their entirety by the passage of FIRREA; it contends only that provisions in such agreements conflicting with FIRREA's capital standards and operational requirements are superseded. Nothing in section 501, which is not concerned with regulatory changes, undermines this interpretation.

### D

Far West asserts the conversion agreement required OTS to include the $1.5 billion credit line Far West received from FHLB–Seattle in calculating the limit on Far West's loans to one borrower. OTS and FDIC dispute this interpretation of the conversion agreement. We need not decide whether the conversion agreement governed calculation of the loan-to-one-borrower limitation; if it did, FIRREA superseded it.

The pre–FIRREA method of calculating such limits was based on "regulatory capital," defined to include intangible assets. The conversion agreement provides that "the components of regulatory capital will be as defined in the Insurance Regulations . . . notwithstanding any subsequent changes in the definition of regulatory capital." It then calculates Far West's regula-

(ii) evaluate the costs under existing Federal Savings and Loan Insurance Corporation agreements with regard to the following—
(I) capital loss coverage,
(II) yield maintenance guarantees,
(III) forbearances,
(IV) tax consequences, and
(V) any other relevant cost consideration;

tory capital by including the $1.5 billion line of credit, an intangible asset.

Under FIRREA, "regulatory capital" is no longer the benchmark for determining the limits on loans to one borrower. These limits are now based on percentages of "unimpaired capital and unimpaired surplus," to be calculated the same way as for national banks—that is, excluding intangible assets. § 301, sec. 5(u), 103 Stat. 310, 12 U.S.C. § 1464(u). There is no reason to think Far West was not to be subject to this new method of calculation.

Congress specifically considered the issue of intangible assets as it related to previous contractual commitments of the Bank Board. By defeating the "Hyde amendment," Congress declined to exempt thrifts which had been operating under pre–FIRREA definitions of "intangible capital" from the operation of the statute. Far West discounts the significance of this legislative history on the ground that the concern of the Hyde amendment, "supervisory goodwill," is a different sort of "intangible asset" than a line of credit. But there is no apparent reason Congress would have expressly declined to create an exception for pre–FIRREA agreements involving one intangible asset, yet implicitly (and without debate) created such an exception for pre–FIRREA agreements involving another intangible asset. *See Guaranty Financial Services*, 928 F.2d at 1004–06 (discussing legislative history); *Franklin Federal*, 927 F.2d at 1340–41 (same).

We conclude OTS's interpretation of FIRREA as superseding inconsistent provisions in the conversion agreement is a reasonable one. *See Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Franklin Federal*, 927 F.2d at 1341.

. . . .
The Corporation shall exercise any and all legal rights to modify, renegotiate, or restructure such agreements where savings would be realized by such actions.
. . . .
§ 501(a), sec. 21A(b)(11)(B), 103 Stat. 373, 12 U.S.C. § 1441a(b)(11)(B).

## III

Far West argues its rights under the conversion agreement were property rights and if FIRREA is interpreted as abrogating those rights, Far West's property has been taken without just compensation. We agree with the Sixth Circuit that if a taking of property rights occurred, "the evidence of congressional intent is strong enough to infer that Congress wanted to effect a taking." *Franklin Federal*, 927 F.2d at 1341.

■ Federal courts are limited in the remedy they may provide for a taking authorized by Congress. Injunctive relief is not available to bar an alleged taking of private property for public use, so long as a suit can be brought subsequent to the taking for compensation. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984). There is no indication in FIRREA Congress intended to withdraw the jurisdiction of the Court of Claims, *see id.* at 1017, 104 S.Ct. at 2880, and indeed the parties have dismissed Far West's taking claim without prejudice to refiling in that court.

■ Since a taking, if one occurred, was authorized by Congress, and a suit for compensation is within the jurisdiction of the Claims Court, we do not reach the question of whether a taking occurred. We vacate the district court's judgment on this issue, so it can be considered by the Claims Court if a claim for compensation is filed.

## IV

We conclude FIRREA superseded inconsistent provisions in the Far West conversion agreement, and reverse the district court's declaratory judgment to the contrary. Since a taking, if one occurred, was authorized by Congress, a claim for compensation lies within the jurisdiction of the Claims Court and we remand this case to the district court with instructions to vacate its judgment on this issue as moot. We also direct the district court to dissolve its permanent injunction.

REVERSED and REMANDED.