United States Court of Appeals,

Fifth Circuit.

No. 91–1570.

SECURITY SAVINGS AND LOAN ASSOCIATION, ET AL., Plaintiffs–Appellees,

v.

DIRECTOR, OFFICE OF THRIFT SUPERVISION, etc., and FDIC, etc., Defendants–Appellants.

May 18, 1992.

Appeal from the United States District Court for the Southern District of Mississippi.

Before WILLIAMS and WIENER, Circuit Judges, and LITTLE, District Judge.[*]

WIENER, Circuit Judge:

Once again, this court must tend to casualties of the savings and loan crisis. This time, the question is whether the United States Government agreed to permit Security Savings and Loan Association (Security) to treat certain items arising from supervisory mergers with several failing thrifts as regulatory capital, and, if it did, whether Congress intended to exempt such contractual rights from the rigorous new capital requirements enacted in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).[1] In addition, we must decide whether Security and its subsidiaries may be required to use consolidated accounting for purposes of determining regulatory capital. Without deciding whether the agreements between the United States and Security rise to the level of contractual rights to treat those certain items as regulatory capital, we find that Congress did not intend FIRREA to preserve such agreements. But we also find that the district court correctly interpreted FIRREA § 301(t)(5)(E) as excepting associations defined in § 301(t)(5)(C)(ii) from consolidated accounting requirements. Therefore, we AFFIRM in part and, in part, REVERSE.

[*]District Judge for the Western District of Louisiana, sitting by designation.

[1]Pub.L. No. 101–73, 103 Stat. 183 (codified throughout 12 U.S.C.).

I. FACTS AND PROCEEDINGS

A. THE ACQUISITIONS

In August 1984, Security, a state-chartered federally insured thrift institution, merged with New North Mississippi Federal Savings and Loan Association (New North), a failing thrift under the conservatorship of the Federal Home Loan Bank Board (FHLBB).[2] Prior to undertaking this merger, Security and the Federal Savings and Loan Insurance Corporation (FSLIC) entered into an assistance agreement (New North Assistance Agreement), which set forth the terms and conditions of the merger, including the nature and extent of FSLIC's assistance to Security. Security agreed to issue a $7 million income capital certificate (ICC), and FSLIC agreed to purchase the ICC with a $7 million promissory note payable in 1991. An ICC is a security, representing an obligation to pay to FSLIC a principal sum plus a return on principal, that was created by FHLBB "to provide a new method of FSLIC financial assistance so that the issuing association could treat the assistance as equity for regulatory net worth and reserve requirements, as well as for financial reporting in accordance with GAAP [Generally Accepted Accounting Principles]."[3] Section 3(a)(4) of the New North Assistance Agreement states that the ICC would be treated as a component of Security's regulatory net worth.[4]

In further facilitation of this merger, FSLIC also agreed to give Security a $3.5 million cash

---

[2]In early 1983, FHLBB assumed control of North Mississippi Savings and Loan Association (Old North) and formed New North Mississippi Savings and Loan Association (New North). After operating New North for a number of months at a substantial loss, FHLBB determined to sell it, and, in late 1983, submitted invitations to bid to a number of healthy associations, including Security.

[3]FHLB Journal (October 1981), reproduced in *FDIC and FSLIC Procedures for Handing Financial Institution Failures and Speculation: Before the Subcommittee of the Committee on Government Operations of the House of Representatives,* 97 Cong. 1st Sess. (1981). The purchase of the ICC was not a contribution to capital, and, accordingly, consideration paid by FSLIC for the ICC did not affect negative net worth.

[4]Section 3(a)(4) states:

> [A]ll cash contributions made under § 3(a)(1)(B), and the CORPORATION'S purchase of Income Capital Certificates pursuant to § 4 shall be credited to the ACQUIRING ASSOCIATION'S net worth account and shall constitute regulatory net worth.

contribution, which, according to section 3(a)(4) of the New North Assistance Agreement, was to be treated as a credit to regulatory capital under the heading "FSLIC Capital Contribution." The cash contribution created an asset called "RAP goodwill."[5]

In addition, when Security acquired New North, GAAP purchase accounting standards and FSLIC's regulations permitted Security to treat the portion of the price in excess of value as an amortizable intangible asset, called "supervisory goodwill," which was used as an element of regulatory capital. By this accounting device, New North's liabilities were turned into intangible assets, thus making it attractive for Security to acquire New North. Although there is no mention of supervisory goodwill in the New North Assistance Agreement, regulatory documents for the merger mention the treatment of intangible assets and approve the use of purchase accounting standards, thereby confirming that the parties anticipated creation of supervisory goodwill. The New North Assistance Agreement provided that it would terminate after three years.[6]

In an unrelated transaction occurring in October 1985, Security acquired Security Trust Federal Savings and Loan Association (Security Trust), through Security's wholly-owned subsidiary, Bailey Mortgage Company (Bailey). This acquisition was also pursuant to an assistance agreement (Security Trust Assistance Agreement) with FSLIC, under which FSLIC agreed to purchase an ICC from Security for $2 million. Like the New North Assistance Agreement, the Security Trust

---

[5]When FSLIC provided cash assistance to the acquiror in connection with the acquisition, GAAP would have required that the amount of the assistance be treated as an asset of the acquired thrift, increasing that thrift's net worth and correspondingly decreasing the amount of goodwill that otherwise would have been created in the acquisition. FHLBB departed from GAAP, however, by permitting some or all of FSLIC's cash assistance to be recorded as a credit to the acquired thrift's new worth, without requiring the amount of pre-assistance goodwill to be reduced. An asset equaling the amount of GAAP goodwill that otherwise would have been lost was termed "RAP goodwill."

[6]The termination clause states:

> Except as otherwise specifically provided in this Agreement, this Agreement shall terminate three years following the Effective Date [August 3, 1984] or on such other date to which the parties or their successor agree in writing.

Assistance Agreement specified that the ICC could be treated as capital. The Security Trust Assistance Agreement stated that it would terminate after five years.[7]

## B. FIRREA'S NEW CAPITAL REQUIREMENTS

In August 1989, Congress enacted FIRREA. FIRREA abolished FSLIC and FHLBB, created the Office of Thrift Supervision (OTS), and placed the rights and duties formerly held by FHLBB with OTS.[8] FIRREA instructs OTS to "prescribe and maintain uniformly applicable capital standards for savings associations,"[9] which must include a leverage limit, a tangible capital requirement, and a risk-based capital requirement.[10] FIRREA specifies the percentage of assets required under each of these categories,[11] and authorizes imposition of draconian sanctions upon non-complying associations.[12] FIRREA curtails use of supervisory goodwill to determine whether regulatory capital requirements are met. Supervisory goodwill must be amortized over no more than 20 years, and cannot be used at all to calculate core capital after January 1, 1995.[13]

---

[7] Other than the five year period, the termination clause in the Security Trust Assistance Agreement was identical to that in the New North Assistance Agreement, see note 6 above.

[8] FIRREA substantially modified the overall federal thrift regulatory scheme. It abolished FSLIC and transferred FSLIC's functions to other agencies; created a new thrift deposit insurance fund under FDIC; eliminated FHLBB and replaced it with OTS—an office within the United States Department of the Treasury—and made OTS's Director responsible for the examination, supervision, and regulation of all federally insured savings associations, and the chartering of federal thrifts; and established the Resolution Trust Corporation, charged with resolving certain closed thrifts. *See* 12 U.S.C. 1437 note; 1441a; and 1821.

[9] 12 U.S.C. § 1464(t)(1)(A).

[10] 12 U.S.C. § 1464(t)(1)(A)(i)–(iii).

[11] 12 U.S.C. § 1464(t)(2).

[12] OTS is required to issue capital directives to non-complying thrifts, which may contain such operating restrictions as the Director believes is appropriate to protect depositors, the insurance fund, and the public. 12 U.S.C. § 1464(t)(6)(B)(ii). OTS must also prohibit asset growth of non-complying thrifts. 12 U.S.C. § 1464(t)(6)(B)(i). Substantial failure to meet capital standards can be the basis for a determination by OTS that one or more of the grounds for appointment of a conservator or receiver exist. 12 U.S.C. § 1464(d)(2)(A) and (B).

[13] 12 U.S.C. § 1464(t)(3)(A).

OTS interprets FIRREA's capital standards as applying to *all* associations that are not specifically excepted. FIRREA has no specific exception for assistance agreements with FSLIC that preceded its enactment. Hence, OTS interprets FIRREA as abrogating such agreements. While FIRREA does include a general savings clause in § 401(g),[14] OTS interprets § 401(g) as not applying to pre-existing assistance agreements. OTS also construes FIRREA as giving it the power to require consolidation of assets and liabilities of all domestic insured subsidiaries with those of their parent associations for the purpose of calculating regulatory capital.

## C. DISTRICT COURT LITIGATION

In November 1989, OTS informed Security that its use of supervisory goodwill, FSLIC's cash contribution, and ICCs did not comply with FIRREA's capital requirements. When Security refused to devise a capital plan consistent with FIRREA's capital requirements and OTS's consolidation regulations, OTS found Security not in compliance with FIRREA. Security thereupon sued FDIC and the Director of OTS to enjoin application of FIRREA's new capital requirements. Security argued that it had a contractual right under its assistance agreements with FSLIC to treat FSLIC's cash contribution in the New North merger and the ICCs in the New North and Security Trust mergers as assets. Security further contended that it had a contractual right, implied-in-fact and expressed in regulatory documents, to treat the supervisory goodwill created in the New North merger as capital. Security asserted that these contractual rights were excepted from FIRREA's capital requirement under the savings clause in § 401(g). Lastly, Security argued that FIRREA explicitly prohibits OTS from requiring consolidation of Security's assets and liabilities with those of its subsidiaries for the purpose of determining regulatory capital.[15]

The district court denied Security's motion for a temporary restraining order in part, reasoning that Security had no contractual right to treat the ICCs in the New North and Security Trust mergers

---

[14]12 U.S.C. § 1437 note.

[15]12 U.S.C. § 1464(t)(5)(E).

and cash contribution in the New North merger as capital under the New North and Security Trust Assistance Agreements because these agreements had terminated. Similarly, the court found no contractual right to treat the supervisory goodwill created in the New North merger as an asset. The court agreed with Security, however, that it was specifically exempted under FIRREA §§ 301(t)(5)(E) and 301(t)(5)(C)(ii) from OTS's consolidated accounting requirements.

After a hearing on merits for a permanent injunction, the district court reversed most of its earlier conclusions, holding, first, that OTS could not require Security to conform with FIRREA's capital requirements. The court found that the termination clauses in the Assistance Agreements were not intended to cover capital accounting standards, and that the parties had intended that Security treat the ICCs as capital for as long as they were outstanding. In addition, the court concluded that the fact that supervisory goodwill was not mentioned in the New North Assistance Agreement was irrelevant because that agreement only concerned "assistance" from FSLIC, and supervisory goodwill was not assistance. Furthermore, according to the district court, regulatory documents and testimony showed that the treatment of supervisory goodwill as capital was either an express term of the agreement between FSLIC and Security or a term implied-in-fact. Having thus determined that Security had a contractual right to treat the cash contribution and ICCs as capital, and the supervisory goodwill as an asset, the court ruled that FIRREA's savings clause in § 401(g) made those rights binding upon OTS. Lastly, the district court reaffirmed its prior decision that Security was exempt from consolidation requirements under § 301(t)(5)(E). 761 F.Supp. 1277.

## II. ANALYSIS

### A. PRESERVATION OF PRE–FIRREA AGREEMENTS

Security argues, and the district court held, that Congress intended FIRREA's savings clause in § 401(g) to preserve FSLIC agreements and FHLBB resolutions such as those at issue in this case. FIRREA § 401(g) provides:

(g) Savings provisions relating to FHLBB.—

(1) Existing rights, duties, and obligations not affected.—Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—

(A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable to such Board ..., and

(B) existed on the day before the date of the enactment of this Act.

The Sixth, Ninth, and Eleventh Circuits have already considered the proper interpretation of FIRREA § 401(g) and agree with OTS that this provision does not exempt agreements, such as those between FSLIC and Security, from FIRREA's strengthened capital requirements.[16]  Following the able instruction of those circuits, we too find OTS's interpretation of § 401(g) to be a reasonable one,[17] supported by FIRREA's structure, its broad language on capital requirements, the explicit provisions on supervisory goodwill, and the wording and context of § 401(g).  FIRREA's legislative history, which is comprehensively reviewed by the Eleventh Circuit in *Guaranty Financial Serv. Inc. v. Ryan,*[18] also supports OTS's textual interpretation.

Inasmuch as we decide here that Congress intended FIRREA to abrogate agreements inconsistent with its rigorous capital requirements, we do not decide whether the New North and Security Trust Assistance Agreements specified that the cash contribution and the ICCs would be treated as capital, or whether the parties contracted to treat supervisory goodwill as an asset.  Like

---

[16]*Franklin Fed. Savings Bank v. OTS,* 927 F.2d 1332, 1338–41 (6th Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991);  *Far West Fed. Bank v. OTS,* 951 F.2d 1093, 1098, rehearing denied, 1991 WL 263161, 1991 U.S.App. LEXIS 18174 (9th Cir.1991);  and *Guaranty Fin. Serv., Inc. v. Ryan,* 928 F.2d 994, 1003–06 (11th Cir.1991).  *Contra Hansen Sav. Bank v. OTS,* 758 F.Supp. 240, 246–47 (D.N.J.1991).

[17]Under *Chevron v. NRDC,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984), to uphold OTS's construction of § 401(g), this court "need not conclude that the agency construction as the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."  Instead, this court decides whether OTS's interpretation of § 401(g) is a reasonable one.

[18]928 F.2d at 1004–06.

the Sixth and Ninth Circuits, we find that "if a taking of property rights occurred, "the evidence of congressional intent is strong enough to infer that Congress wanted to effect a taking.' "[19]  A suit for compensation under the Fifth Amendment to the United States Constitution is within the jurisdiction of the Court of Claims, however.[20]  Therefore, with regrets that our decision today necessarily prolongs this dispute, we reverse the district court's judgement on this issue so that it may be considered by the Court of Claims should Security elect to file a suit for compensation.

## B. CONSOLIDATION REQUIREMENTS

OTS promulgated regulations requiring consolidation of assets and liabilities of *all* domestic insured subsidiaries with those of their parent associations for purposes of determining compliance with capital standards.[21]  The district court enjoined OTS from requiring Security to abide by these regulations, reasoning that the specific exception in § 301(t)(5)(E) prohibits OTS from requiring associations such as Security and its subsidiaries to use consolidated accounting standards.[22]  OTS challenges this ruling.

Section 301(t)(5)(E) provides in relevant part:

(E) Consolidation of subsidiaries not separately capitalized

In determining compliance with capital standards prescribed under paragraph (1), the assets and liabilities of each of a savings association's subsidiaries (other than any subsidiary described in subparagraph (C)(ii)) shall be consolidated with the savings association's assets and liabilities, unless all of the savings association's investments in and extensions of credit to the subsidiary are deducted from the savings association's capital pursuant to subparagraph (A).

Subsidiaries defined in § 301(t)(5)(C)(ii), which are expressly excluded from § 301(t)(5)(E), are those

---

[19]*Far West,* 951 F.2d at 1100, quoting *Franklin Federal,* 927 F.2d at 1341.

[20]*Id.* at 1100.

[21]12 C.F.R. 567.1(ff);  567.5(a)(2)(vi);  567.9(c)(4);  see also 12 C.F.R. 567.1(a);  567.8;  567.9(a).

[22]12 U.S.C. § 1464(t)(5)(E).

that are themselves both "insured depository institution[s]" and were "acquired by the parent depository institution prior to May 1, 1989."[23] Security's subsidiaries were acquired prior to May 1, 1989. FIRREA has *no* provision that expressly requires a particular method of accounting for those associations excepted from § 301(t)(5)(E).

OTS argues that § 301(t)(5)(E), by its own terms, is inapplicable to Securities' subsidiaries. It contends that § 301(t)(5)(E) should be interpreted as mandating only that certain associations *must* use consolidated accounting—not that those associations defined in § 301(t)(5)(C)(ii) are exempted from consolidated accounting. In other words, as interpreted by OTS, FIRREA is *silent* on the accounting treatment of associations that come within the exception in § 301(t)(5)(E). OTS locates its statutory authority to promulgate regulations requiring consolidated accounting standard for those associations defined in § 301(t)(5)(C)(ii) in FIRREA's provisions granting OTS broad power to provide for "safe and sound operation, and regulation of savings associations,"[24] to issue regulations and make determinations regarding the operations of savings institutions,[25] and to "require all savings associations to achieve and maintain adequate capital...."[26]

In *Chevron v. NRDC,*[27] the Supreme Court articulated the process by which federal courts review administrative constructions of statutes. First, we decide whether Congress has spoken to the precise question at issue. Then, if Congress's intent is not clear—if the statute is silent or ambiguous with respect to the specific issue—we decide whether the administrative agency's interpretation of the statute is reasonable.

---

[23]12 U.S.C. § 1464(t)(5)(C)(ii)(I) and (II).

[24]12 U.S.C. § 1463(a)(1).

[25]12 U.S.C. §§ 1462a(b), 1463(a)(2), 1464(s).

[26]12 U.S.C. § 1464(s);  see also 12 U.S.C. 1464(t)(2).

[27]467 U.S. at 842–43 and n. 11, 104 S.Ct. at 2781 and n. 11.

We find that OTS's counter-intuitive interpretation of FIRREA is neither reasonable nor permissible. First and foremost, we cannot agree with OTS that § 301(t)(5)(E) is *silent* on the accounting treatment of associations acquired prior to May 1989. Rather, § 301(t)(5)(E) affirmatively excepts those subsidiaries defined in § 301(t)(5)(C)(ii) from the consolidated accounting standards required for all other associations. If Congress intended the statute to be silent, logically it would have required certain associations to use consolidated accounting and simply said *nothing* about the others. Moreover, had Congress intended to leave open the possibility of consolidated accounting treatment of those associations defined in § 301(t)(5)(C)(ii), what reason could it have had to exclude such associations from § 301(t)(5)(E)? Congress knew well how to draft all-encompassing provisions, as evidenced by FIRREA's capital requirements, but in this instance, for whatever reason, it elected not to do so. We also take comfort in FIRREA's legislative history, which supports our interpretation of § 301(t)(5)(E), albeit only weakly.[28]

Therefore, given that § 301(t)(5)(E) specifically excepts subsidiaries defined in § 301(t)(5)(C)(ii) from consolidated accounting, we conclude, as did the district court, that FIRREA's broad but unspecific grants of regulatory authority do not give OTS the authority to require Security and its subsidiaries to use consolidated accounting standards.

We admit, however, certain discomfort with our conclusion—OTS makes a convincing argument that consolidated accounting ensures that FIRREA's capital requirements are not circumvented through double-counting of capital assets or other such "accounting gimmickry." But

---

[28]FIRREA's legislative history contains the following discussion between Senators D'Amato and Garn about consolidated capital requirements:

> Mr. D'Amato: ... It is my understanding that the capital requirements established under the bill apply separately and not on a consolidated basis to a savings association and each existing subsidiary savings association acquired before May 1, 1989. Is my understanding correct?

> Mr. Garn: The Senator is correct.

135 Cong.Rec.S.—10 1909 (daily ed. August 4, 1989).

§ 301(t)(5)(E)'s explicit exception of associations in § 301(t)(5)(C)(ii) from its requirements indicates Congress's intent to deprive OTS of the authority to mandate the consolidated accounting for *all* domestic insured subsidiaries. OTS should therefore make its policy argument to Congress.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court and instruct that court on remand to dissolve its order permanently enjoining OTS from excluding unamortized New North supervisory goodwill, the New North ICC and cash contribution, and the Security Trust ICC from Security's regulatory capital. We affirm, however, that portion of the district court's order permanently enjoining OTS from requiring consolidation of all depository subsidiaries with Security for purposes of determining capital compliance.

REVERSED and REMANDED in part, and, in part, AFFIRMED.