119 F.3d 1358
 97 Cal. Daily Op. Serv. 5457, 97 Daily Journal
D.A.R. 8851
FAR WEST FEDERAL BANK, S.B., Plaintiff,
and
Trinity Ventures, Ltd., et al.; U.S. Venture Partners III;
U.S.V. Entrepreneur Partners, et al., Plaintiffs-Appellees,
v.
OFFICE OF THRIFT SUPERVISION-DIRECTOR; Federal Home Loan
Bank of Seattle; Federal Home Loan Bank Board, Defendants,
and
Federal Deposit Insurance Corporation, in its own capacity
and as successor in interest to the Federal
Savings & Loan Insurance Corporation,
Defendant-Appellant.
TRINITY VENTURES, LTD.; U.S. Venture Partners III;
Institutional Venture Partners III, et al; U.S.V.
Entrepreneur Partners, Plaintiffs-Appellants,
v.
OFFICE OF THRIFT SUPERVISION-DIRECTOR; Federal Deposit
Insurance Corporation, in its own capacity and as successor
in interest to the Federal Savings & Loan Insurance
Corporation; Federal Home Loan Bank Board; Federal Savings
& Loan Insurance Corporation, Defendants-Appellees.
 Nos. 92-35597, 92-36535.
 United States Court of Appeals,
Ninth Circuit.
 Argued Jan. 3, 1994.*
Submission Deferred Jan. 21, 1994.
Re-Argued and Submitted May 7, 1997.
Decided July 10, 1997.
 
 Wesley G. Howell, Jr., Gibson Dunn & Crutcher, New York City, John C. Millian, John K. Bush, Jeffrey T. Gilleran, and Jane Church, Gibson Dunn & Crutcher, Washington, DC, and Barnes H. Ellis and Christine Kitchel, Stoel Rives, Portland, OR, for plaintiffs-appellees-cross-appellants.
 Ann S. DuRoss, Robert D. McGillicuddy, Colleen B. Bombardier, Daniel F. Ross, and Jeannette E. Roach, Federal Deposit Insurance Corporation, Washington, DC, Douglas Letter and Scott R. McIntosh, United States Department of Justice, Washington, DC, for defendants-appellants-cross-appellees.
 Appeals from the United States District Court for the District of Oregon; Owen M. Panner, Chief District Judge, Presiding. D.C. No. CV-90-103-OMP.
 Before: LAY,** BEEZER, and TROTT, Circuit Judges.
 TROTT, Circuit Judge:
 
 OVERVIEW
 
 1
 In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (1989), in part to resolve the widespread financial problems of federally-chartered thrift institutions. FIRREA established stricter capital requirements for thrifts and stricter limits on the amount a thrift may loan to a single borrower. These stricter regulations superseded an earlier agreement (the "Conversion Agreement") by the Federal Home Loan Bank Board ("FHLBB") to afford Far West Federal Bank ("Far West") more lenient treatment.
 
 
 2
 The principal question before us in this appeal is whether FIRREA's abrogation of the Conversion Agreement entitled Far West's investors to rescission of the agreement and restitution of their investment. The district court held that it did and ordered the FDIC to pay $26.6 million in restitution. We affirm.
 
 BACKGROUND
 
 3
 Far West was a federally-chartered stock savings association based in Portland, Oregon. Beginning in the early 1980s, Far West suffered financial losses and, by 1986, had a negative net worth. The Federal Savings and Loan Insurance Corporation ("FSLIC")-the insurance arm of the FHLBB-encouraged Far West to seek investors to recapitalize Far West, hoping to obviate the need for immediate government liquidation.
 
 
 4
 In 1987, Far West and the Federal Home Loan Bank of Seattle ("FHLB-Seattle"), one of FHLBB's regional banks, identified a group of venture capitalists (the "Investors") that was willing to supply Far West with new capital under certain conditions. Specifically, the Investors insisted on certain regulatory forbearances that they hoped would render Far West financially viable.
 
 
 5
 As a result of the ensuing negotiations among the Investors, Far West, FHLBB, and FHLB-Seattle, the parties entered into a series of agreements. In September 1987, the Investors and Far West executed a "Stock Purchase Agreement," under which the Investors agreed to provide Far West with approximately $26.6 million in new capital through the purchase of Far West stock. The Stock Purchase Agreement was contingent upon, among other things, the FHLBB's approval of Far West's conversion from a mutual savings association to a stock association and upon Far West's receipt from the FHLBB of regulatory forbearances.
 
 
 6
 In December 1987, FHLB-Seattle and Far West executed a "Credit Facility Agreement," under which FHLB-Seattle agreed to provide Far West with a $1.5 billion line of credit. At the same time, the FHLBB approved Far West's conversion application. The FHLBB also issued a forbearance letter, which granted Far West a ten-year forbearance from enforcement of the regulatory capital requirements then set forth in 12 C.F.R. § 563.13 (1987). As a condition of this forbearance, Far West and its Board of Directors entered into a "Conversion Agreement" with the FHLBB, which established a "Modified Regulatory Capital Requirement" to be followed by Far West during the ten-year forbearance period.
 
 
 7
 The Conversion Agreement defined the credit facility as an intangible asset, which allowed Far West to include the facility as a component of its regulatory capital. The Conversion Agreement also allowed Far West to amortize the credit facility on a twenty-five-year, straight-line schedule.
 
 
 8
 The credit facility and the Modified Regulatory Capital Requirement enabled Far West to operate successfully for several years. Under then-existing regulations, a thrift was precluded from making loans to a single borrower that exceeded the Loan to One Borrower ("LTOB") limit. The LTOB was calculated as a percentage of regulatory capital. Because the Conversion Agreement defined the credit facility as an intangible asset and permitted Far West to include intangible assets as part of its regulatory capital, the Conversion Agreement increased Far West's LTOB limit beyond what it otherwise would have been. The effect was to enable Far West to make larger, more profitable loans.
 
 
 9
 In August 1989, however, Congress enacted FIRREA, completely overhauling the structure of federal thrift regulation by:
 
 
 10
 (1) abolishing FSLIC and transferring its functions to other agencies; (2) creating a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation (FDIC); (3) replacing the [FHLBB] with the Office of Thrift Supervision (OTS), a Treasury Department office with responsibility for the regulation of all federally insured savings associations; and (4) establishing the Resolution Trust Corporation (RTC) to liquidate or otherwise dispose of certain closed thrifts and their assets.
 
 
 11
 United States v. Winstar Corp., --- U.S. ----, ----, 116 S.Ct. 2432, 2446, 135 L.Ed.2d 964 (1996). Most important for this case, FIRREA directed OTS to "prescribe and maintain uniformly applicable capital standards for savings associations." 12 U.S.C. § 1464(t)(1)(A). It also excluded intangible assets from the calculation of regulatory capital.
 
 
 12
 On January 9, 1990, OTS issued Thrift Bulletin 38-2, which expressly stated the OTS's view that FIRREA abrogated existing forbearance agreements such as the Conversion Agreement. Based on Far West's non-compliance with the new capital requirements, OTS imposed growth and operating restrictions on Far West. It also imposed a much lower LTOB limit of $500,000.
 
 
 13
 In January 1990, Far West and the Investors filed this action against OTS, FHLB-Seattle, and FDIC. They sought injunctive relief preventing OTS and FDIC from taking any regulatory steps that were inconsistent with the terms of the Conversion Agreement. In the alternative, they sought rescission of the agreement and restitution of the benefits conferred on the government. Finally, the Investors sought an award of just compensation under the Takings Clause of the Fifth Amendment.
 
 
 14
 The district court ruled that FIRREA did not abrogate the Conversion Agreement, because the statute preserved existing obligations and duties of FHLBB. Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision, 738 F.Supp. 1559, 1563-64 (D.Ore.1990). It also concluded that the government's repudiation of the agreement constituted a taking under the Fifth Amendment.[1] Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision, 746 F.Supp. 1042, 1051 (D.Ore.1990). Accordingly, the district court entered a permanent injunction prohibiting OTS from enforcing FIRREA against Far West. Id.
 
 
 15
 In a prior appeal, we reversed the judgment of the district court and ordered the district court to dissolve the permanent injunction. Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision, 951 F.2d 1093 (9th Cir.1991). We held that FIRREA did abrogate the Conversion Agreement. Id. at 1099. We also vacated the district court's judgment on the Investors' taking claim, holding that if a taking did occur, it was authorized by Congress, and thus, the claim was within the exclusive jurisdiction of the claims court. Id. at 1100.
 
 
 16
 The district court then considered the Investors' remaining claim against FDIC for rescission and restitution and, in March 1992, granted summary judgment in favor of the Investors. Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision, 787 F.Supp. 952 (D. Ore 1992). The district court granted the Investors rescission and restitution in the amount of the Investors' initial cash investment in Far West, but rejected their claims for prejudgment interest and additional restitution in the amount of Far West's increase in value under the Investors' stewardship. Id. at 961. The district court ordered FDIC to pay $26,610,000 in restitution. Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision, 810 F.Supp. 1109, 1110 (D.Ore.1992).
 
 
 17
 FDIC appeals the district court's grant of summary judgment on the Investors' rescission and restitution claims. The Investors cross-appeal the district court's denial of prejudgment interest and its refusal to hold a hearing to determine whether the Investors are entitled to restitution in an amount greater than their $26.6 million investment.
 
 STANDARD OF REVIEW
 
 18
 We review a grant of summary judgment de novo. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the facts in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Id.
 
 DISCUSSION
 
 19
 * As an initial matter, we must decide whether the Investors have standing to sue for FDIC's alleged breach of the Conversion Agreement. According to FDIC, the Investors were not parties to the Conversion Agreement itself, because the Investors did not sign the Conversion Agreement in their individual capacities, but only in their capacities as directors of Far West. FDIC contends that the injury resulting from FIRREA's abrogation of the Conversion Agreement is an injury to Far West, not to the Investors and that the Investors are simply shareholders who lack standing to seek relief for injuries suffered by the corporation. See Shell Petroleum, N.V. v. Graves, 709 F.2d 593, 595 (9th Cir.1983).
 
 
 20
 FDIC's argument ignores the nature and circumstances of the entire agreement among the Investors, Far West, FHLBB, and FHLB-Seattle. At the time of the Conversion Agreement, FHLBB faced potentially enormous financial responsibility for Far West's failure and as a result, FHLBB made promises to entice the Investors to recapitalize Far West. FHLBB's inability to continue to regulate Far West in accord with those promises unquestionably injured the Investors, who were induced by the FHLBB's promises to pour $26.6 million into a failing thrift.
 
 
 21
 Under the Restatement, a third party who is an intended beneficiary of a contract may sue to enforce the contract or to obtain an appropriate remedy for breach. See Restatement (Second) of Contracts § 304 (1981). The Conversion Agreement specifically identifies both Far West and its prospective shareholders as intended beneficiaries of FHLBB's promises.[2] Furthermore, as discussed above, the circumstances of the transaction indicate that all of the parties intended the benefits of FHLBB's promises to run to the Investors, so that the Investors would be inclined to risk their money in Far West.
 
 
 22
 In sum, even though the Investors were not signatories to the Conversion Agreement itself, it is clear that the sole purpose of the entire transaction among the Investors, Far West, FHLBB, and FHLB-Seattle was for the Investors to invest $26.6 million in Far West in exchange for promises by the FHLBB to regulate Far West in a manner that would make their investment financially sound. To deny the Investors an opportunity to recover for FHLBB's breach simply because Far West and not the Investors signed one of the documents evidencing those promises would place the form of the agreement over its substance. We decline to take such a formalistic and narrow view of the parties' agreement.
 
 
 23
 "It is well settled that an individual cause of action can be asserted when the wrong is both to the stockholder as an individual and to the corporation." See Buschmann v. Professional Men's Ass'n, 405 F.2d 659, 662 (7th Cir.1969). Because the circumstances of the transaction indicate that the Investors were intended beneficiaries of the Conversion Agreement and because FHLBB's breach of its promise injured the Investors personally, as well as injuring Far West, we hold that the Investors have standing to sue for rescission of the agreement and restitution of their investment.
 
 II
 
 24
 The district court held that the Investors were entitled to rescission and restitution because "FIRREA's passage resulted in the frustration of the [Conversion Agreement's] fundamental purpose." 787 F.Supp. at 960. We decline to adopt the district court's reliance on the doctrine of frustration of purpose as a basis for ruling in favor of the Investors. Frustration of purpose is an excuse for non-performance, not a cause of action. See Restatement (Second) of Contracts § 265 ("Where, after a contract is made, a party's principal purpose is substantially frustrated ... his remaining duties to render performance are discharged ....") (emphasis added). Because the Investors seek damages for the government's non-performance, not discharge from their remaining duties (in fact, they had no remaining duties as investors), the frustration of purpose doctrine does not offer the best framework for deciding the merits of the Investors' claim.
 
 
 25
 The Investors argued in the alternative to the district court that they were entitled to rescission and restitution because the government breached the Conversion Agreement. We affirm on this ground. See United States v. Washington, 969 F.2d 752, 755 (9th Cir.1992) (appellate court may affirm on any ground supported by the record, even if district court did not rely on that ground).
 
 
 26
 After Winstar, there is no serious dispute as to whether the Conversion Agreement created a contractual obligation on the part of the government to regulate Far West in accord with its terms. The Conversion Agreement specifically provides that Far West would be deemed in compliance with regulatory capital requirements "for all purposes under the Insurance Regulations [then in effect] if Far West is in compliance with its Modified Regulatory Capital Requirement." Schedule P of the agreement provides that "the components of 'regulatory capital' will be as defined [under then-effective Insurance Regulations] ..., notwithstanding any subsequent changes in the definition of regulatory capital." As FDIC concedes, this language, read in light of the circumstances of its execution, is fairly read as a commitment by the government "to regulate [Far West] in a particular fashion." Winstar, --- U.S. at ----, 116 S.Ct. at 2477 (Scalia, J., concurring).
 
 
 27
 Although FDIC concedes that the government made an enforceable promise in the Conversion Agreement to apply the Modified Regulatory Capital Requirement in regulating Far West, it nevertheless argues that the government made no promises regarding the calculation of Far West's LTOB limit. We disagree. Under pre-FIRREA regulations, the LTOB limit was calculated as a percentage of regulatory capital. Thus, by promising to define regulatory capital to include intangible assets "for all purposes" under the regulations, the government also promised that Far West's LTOB limit would reflect those intangible assets.
 
 
 28
 On appeal, FDIC has abandoned its sovereign defenses to liability-based on the Unmistakability Doctrine and the Sovereign Acts Doctrine[3]-in light of the Supreme Court's holding in Winstar. As FDIC concedes, the Supreme Court's reasons for rejecting the application of these "sovereign" defenses in Winstar apply with equal force to this case. See id. at ---- - ----, ---- - ----, 116 S.Ct. at 2452-60, 2468-69 (Souter, J., concurring); see also id. at ---- - ----, 116 S.Ct. at at 2476-78 (Scalia, J., concurring).
 
 
 29
 FDIC still argues, however, that the injunctions entered by the district court prevented the government from ever breaching the Conversion Agreement. They observe that the FIRREA regulations were only in effect from January 1990 to May 1990, when the district court entered a temporary restraining order which was ultimately replaced by a permanent injunction. By December 1991, when this court ordered the district court to dissolve the permanent injunction, the directors already had abandoned Far West and placed it into receivership. According to FDIC, "[t]hese successive injunctions effectively shielded Far West from whatever adverse impact it might otherwise have suffered from FIRREA."
 
 
 30
 This argument misses the point. At the moment OTS announced its intention to impose FIRREA regulations on Far West, the government repudiated the Conversion Agreement. Following repudiation, the Investors had the absolute right to cease their own performance and to obtain rescission and restitution. See Restatement (Second) of Contracts § 253 ("Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach."). FDIC's argument implies that the Investors would have to prove that they suffered consequential damages (e.g., loss of their investment) in order to sue for breach. There is simply no basis in contract law for this proposition.
 
 
 31
 Winstar effectively resolves all viable arguments regarding FDIC's contract liability for breaching the Conversion Agreement. FDIC now concedes that the government promised to regulate Far West in a particular fashion and that imposition of the FIRREA regulations was inconsistent with that promise. FDIC's "sovereign" defenses are no longer viable after Winstar. Thus, FDIC's only remaining arguments represent challenges to the validity of restitution as a remedy for FDIC's liability.
 
 III
 
 32
 FDIC contends that the Investors are barred from seeking rescission and restitution because they previously sought and received injunctive relief that amounted to specific performance. They invoke the equitable principle, known as the doctrine of election of remedies, that "[a] party may not invoke (or at least may not be granted) a remedy based upon affirmance of a contract ... and also a remedy based upon disaffirmance, such as rescission." Continental Sand & Gravel, Inc. v. K & K Sand & Gravel, Inc., 755 F.2d 87, 93 (7th Cir.1985).
 
 
 33
 Because the Investors never received an award of specific performance, this argument is without merit. We vacated the district court's permanent injunction and remanded the case for the district court to proceed on the restitution claim. 951 F.2d at 1096. As the Restatement provides, the doctrine of election of remedies "applies only where a party pursues a remedy that he actually has. A party is not precluded from pursuing other remedies by the fact that he has made a mistaken attempt to obtain a remedy that is not available to him...." Restatement (Second) of Contracts § 378 cmt. c.
 
 
 34
 FDIC next argues that the Investors are not entitled to restitution because they did not confer a benefit on FDIC by their performance under the Conversion Agreement. See Restatement (Second) of Contracts § 370 ("A party is entitled to restitution ... only to the extent that he has conferred a benefit on the other party by way of part performance or reliance."). The district court ruled that FDIC did receive a benefit because "the FHLBB, through FSLIC, was able to avoid the heavy cost of resolving Far West." 787 F.Supp. at 959. FDIC challenges this conclusion, arguing that the record does not support the conclusion that the FHLBB would have actually resolved Far West in 1987.
 
 
 35
 Whether the government would have actually resolved Far West in 1987 or not is irrelevant, because there is no question that the Investors conferred some benefit on the government. The government actively sought investors to recapitalize Far West. As the district court noted, "without the prospect of [savings on the part of the government], there would have been no incentive for the government to contract with the plaintiffs." 787 F.Supp. at 959. By investing $26.6 million in Far West, the Investors at the very least bore some of the government's risk of loss in the event of Far West's failure. The government would not have granted them regulatory forbearances if their investment did not promise either (1) to delay Far West's impending demise, (2) to reduce the risk that the government would have to resolve Far West, or (3) to reduce the magnitude of the government's exposure in the event that Far West failed. In short, the Investors do not have to prove that their investment actually prevented the ultimate failure of Far West in order to recover restitution.
 
 IV
 
 36
 In their cross-appeal, the Investors argue that the district court erred in denying them prejudgment interest on the basis of sovereign immunity. Sovereign immunity generally bars an award of interest against a federal agency "unless Congress affirmatively mandates that result" (i.e., unless Congress expressly waives immunity with respect to interest). Library of Congress v. Shaw, 478 U.S. 310, 316, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1986). As the district court noted, Congress has never expressly waived FDIC's immunity against prejudgment interest.
 
 
 37
 One exception to this rule applies, however, where the government agency has "cast off the cloak of sovereignty and assumed the status of a private commercial enterprise." Id. at 317 n. 5, 106 S.Ct. at 2963 n. 5. In Loeffler v. Frank, 486 U.S. 549, 556, 108 S.Ct. 1965, 1969-70, 100 L.Ed.2d 549 (1988), the Supreme Court held that, "[b]y launching the Postal Service into the commercial world, and including a sue-and-be-sued clause in its charter," Congress waived the immunity of the Postal Service from all the "natural and appropriate incidents of legal proceedings," including prejudgment interest awards.
 
 
 38
 Congress included a sue-and-be-sued clause identical to that of the Post Office in FDIC's charter. See 12 U.S.C. § 1819(a). Thus, we must decide whether FDIC has "assumed the status of a private commercial enterprise," thereby subjecting it to a prejudgment interest award under the reasoning of Loeffler.
 
 
 39
 Unlike the Postal Service, FDIC operates as a governmental, regulatory entity, not as a private commercial enterprise. As the Supreme Court explicitly noted in Loeffler, when Congress created the Postal Service, it designed the service to " 'be run more like a business than had its predecessor, the Post Office Department.' " 486 U.S. at 556, 108 S.Ct. at 1969 (quoting Franchise Tax Bd. of Cal. v. United States Postal Serv., 467 U.S. 512, 104 S.Ct. 2549, 81 L.Ed.2d 446 (1984)). FDIC, by contrast, was created by the Federal Deposit Insurance Act "to regulate banks." Lambert v. FDIC, 847 F.2d 604, 606 (9th Cir.1988). Unlike the Post Office, the FDIC operates at a loss to the Treasury; it is not a profit-making enterprise. See H.R.Rep. No. 101-54(I), at 103 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 103.
 
 
 40
 In short, because FDIC is not a commercial entity and because Congress has not explicitly waived its immunity against interest, FDIC is not subject to a prejudgment interest award. Thus, the district court did not err by denying the Investors prejudgment interest. See Resolution Trust Corp. v. Federal Sav. & Loan Ins. Corp., 25 F.3d 1493, 1506 (10th Cir.1994) (holding that FDIC is immune against interest).
 
 
 41
 The Investors also request a remand for a hearing on the appropriate amount of restitution. They argue that the benefits which they conferred on the government by their investment exceed the value of their $26.6 million cash infusion.
 
 
 42
 The proper measure of restitution depends on the particular circumstances of a given case. It is within the trial court's discretion to determine the measure of restitution that justice requires. See Restatement (Second) of Contracts § 371 cmt. a. The parties do not dispute the amount of money that the Investors invested in Far West. Because restitution in this amount fully restores the Investors to their status quo ante, it is a reasonable measure of restitution. The district court did not abuse its discretion in denying a trial and ordering the payment of $26.6 million in restitution. See Resolution Trust Corp., 25 F.3d at 1505 (district court did not abuse its discretion in ordering restitution based on the undisputed amount that the investors infused into a failing thrift).
 
 CONCLUSION
 
 43
 We affirm the district court's judgment against FDIC in all respects. The undisputed facts demonstrate that the government repudiated the Conversion Agreement. This repudiation immediately entitled the Investors to rescission of the agreement and restitution of the benefits that they bestowed on the government.
 
 
 44
 We also affirm the district court's order of restitution in the amount of $26.6 million. The district court did not abuse its discretion in measuring restitution according to the amount of the Investors' capital contribution to Far West. In addition, Congress has not waived FDIC's immunity from suit for prejudgment interest.
 
 
 45
 AFFIRMED.
 
 
 
 *
 The original panel, The Honorable Cecil F. Poole, The Honorable Stephen S. Trott, Circuit Judges, and The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii sitting by designation, was replaced on January 17, 1997
 
 
 **
 The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Meanwhile, the district court denied the government's motion to sever the Investors' rescission and restitution claim and transfer it to the claims court. The district court ruled that jurisdiction over this claim was not limited to the claims court under the Tucker Act because FIRREA's "sue and be sued" clause authorized jurisdiction in the district court. Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision, 744 F.Supp. 233, 237-38 (D.Ore.1990). On an interlocutory appeal, the Federal Circuit affirmed the jurisdictional decision of the district court. Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision, 930 F.2d 883, 887-89 (Fed.Cir.1991)
 
 
 [2]
 Recital E in the Conversion Agreement states: "The Far West parties acknowledge that the level of risk implied in the Modified Regulatory Capital Plan submitted to and approved by the FHLBB as part of the supervisory conversion justify and require [sic] the actions described herein for the benefit of Far West and its stockholders and that the interests of Far West and its stockholders would best be served by full cooperation with the FHLBB...." (Emphasis added)
 
 
 [3]
 The Unmistakability Doctrine provides that contracts limiting the government's future exercise of regulatory authority must be expressed in unmistakable terms. The Sovereign Acts doctrine provides that government as contractor cannot be held liable for the acts of government as regulator